**DRAGON CEMENT COMPANY, Inc.,**
**Plaintiff, Appellant,**

v.

**UNITED STATES of America,**
**Defendant, Appellee.**

**No. 5186.**

United States Court of Appeals
First Circuit.

May 14, 1957.

Joseph B. Brennan, Atlanta, Ga., with whom Frederic A. Collins, New York City, Edward C. Thayer, Boston, Mass., and Joseph B. Campbell, Augusta, Me., were on brief, for appellant.

Gerard J. O'Brien, Atty., Dept. of Justice, Washington, D. C., with whom Charles K. Rice, Asst. Atty. Gen., Hilbert P. Zarky and Sheldon I. Fink, Attys., Dept. of Justice, Washington, D. C., and Peter Mills, U. S. Atty., Portland, Me., were on brief, for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Chief Judge.

Appellant, a Maine corporation, in its capacity as successor (by merger effective November 30, 1951) to Lawrence Portland Cement Company, a Pennsylvania corporation, brought this action in the United States District Court for the District of Maine, seeking recovery of federal income and excess profits taxes for the period January 1 to November 30, 1951, in the amount of $483,522.19, with interest. The facts were not in dispute and were recited in a stipulation. Both parties having moved for summary judg-

ment, the district court on September 24, 1956, entered a judgment the first paragraph of which (as subsequently amended) decreed that the plaintiff recover of the defendant the sum of $10,546.46, with interest, on account of a deductible tax loss under § 23(f) of the Internal Revenue Code of 1939, 26 U.S. C.A. (I.R.C.1939) § 23(f), an issue which is no longer in the case, and the second paragraph of which decreed as follows:

> "2. That plaintiff take nothing further in consequence of plaintiff's complaint as to the issue of percentage depletion and as to that issue, the action be and it is hereby dismissed on the merits."

The taxpayer has appealed from that portion of the judgment denying recovery to it under the percentage depletion issue, so that the case now before us turns solely on a question of statutory interpretation of § 114(b) (4) (B) of the 1939 Code, as amended, which defines the term "gross income from mining" for use in determining the basis for percentage depletion allowed as a deduction from income derived from certain mines and natural mineral deposits.

The allowance for depletion has been a controversial subject for years, and officials of the executive branch have sought from time to time, with conspicuous lack of success, to persuade the Congress to eliminate some of its alleged overgenerous features. See Mertens, Law of Federal Income Taxation § 24.04 (1954). We are not concerned with the wisdom or policy of the statutory allowance, once we are sure what the allowance is, for it is plainly our judicial function merely to apply the allowance as Congress wrote it and meant it.

The need for and fairness of some allowance for depletion proceeds from the fact that the production of income through the exploitation of natural resources is accompanied by an inevitable consumption of capital in the form of the gradual exhaustion of the natural resource being exploited. Thus the allowance serves to offset the injustice of classifying only as income what might be regarded as income commingled with return of capital, and serves also as an incentive to encourage capital expenditures in the direction of discovery and exploitation of natural resources.

Of the three types of depletion allowance prescribed at various times by the Congress, percentage depletion (with which we are now concerned) is to be contrasted with cost depletion and discovery depletion. Cost depletion, based upon the cost to the taxpayer of the particular deposit, seeks to return to the taxpayer free of tax that portion of his cost attributable to the amount of the deposit used up in earning the income on which he is taxed during a given taxable year. Discovery depletion seeks to reward the taxpayer for the discovery of unknown natural deposits, and has usually been based upon the fair market value of the deposit within thirty days after the date of its discovery. By the third type of depletion allowance, percentage depletion, the Congress hoped to furnish an easily computable allowance that would avoid many of the complications arising in connection with the computation of cost or discovery depletion. Percentage depletion is based upon a fixed percentage of the income realized during the taxable year from the exploitation of a piece of property—the percentage varying, somewhat arbitrarily, depending upon the kind of deposit involved.

With the gradual enlargement of the categories of mineral properties to which the percentage depletion became applicable, the Congress has at the same time automatically eliminated discovery depletion in respect to such deposits.[1] In general, percentage depletion has remained as an alternative to cost depletion, so that even if the taxpayer fails to establish the cost of the property, he nevertheless may be entitled to the allowance of a percentage depletion. It is also

---

1. The 1954 Code has now abolished discovery depletion entirely as applied to future years.

true, as pointed out in Mertens, Law of Federal Income Taxation § 24.31a (1954), "that through percentage depletion a taxpayer may recover more than his cost over the life of the property."

For present purposes we need go no further back than to the provisions of the Internal Revenue Code of 1939.

Section 23 of this Code contained the following (53 Stat. 12, 14):

"Sec. 23. Deductions from Gross Income.

"In computing net income there shall be allowed as deductions:
* * *

"(m) Depletion.—In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. * * *

"(n) Basis for Depreciation and Depletion.—The basis upon which depletion, exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be as provided in section 114."

Section 114(b) (1) stated as the general rule (53 Stat. 45) that the basis for the depletion allowance should be the adjusted basis in § 113(b) for determining gain upon the sale or other disposition of such property, except as otherwise provided in the ensuing paragraphs numbered (2), (3), and (4). Paragraph (2) related to discovery value in the case of certain mines. Paragraph (3) gave a percentage depletion formula for oil and gas wells. Paragraph (4) gave percentage depletion formulas for coal, metal, and sulphur mines (but not including the type of deposit involved in the case at bar), and provided allowances based upon a prescribed percentage of the "gross income from the property during the taxable year".

The phrase "gross income from the property" was undefined as it appeared in the 1939 Code. It thus had a lurking ambiguity where the mine owner customarily performed more than merely extractive operations before realizing any income; in such cases, would the basis for the depletion allowance include gross income from what in other contexts might be described as manufacturing operations upon the extracted property? The statute did not make this point clear, and Regulations 111, as originally issued, naturally sought to narrow the scope of the allowance.

In the Revenue Act of 1943 (58 Stat. 45), the Congress attempted to resolve this ambiguity by inserting a definition of "gross income from the property" in a new § 114(b) (4) (B), reading in part as follows:

"(B) Definition of Gross Income From Property.—As used in this paragraph the term 'gross income from the property' means the gross income from mining. The term 'mining', as used herein, shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products. The term 'ordinary treatment processes', as used herein, shall include the following: (i) In the case of coal—cleaning, breaking, sizing, and loading for shipment; (ii) in the case of sulphur—pumping to vats, cooling, breaking, and loading for shipment; (iii) in the case of iron ore, bauxite, ball and sagger clay, rock asphalt, and minerals which are customarily sold in the form of a crude mineral product—sorting, concentrating, and sintering to bring to shipping grade and form, and loading for shipment; and (iv) in the case of lead, zinc, copper, gold, silver, or fluorspar ores, potash, and ores which are not customarily sold in the form of the crude mineral product—crushing, grinding, and beneficiation by concentration (grav-

ity, flotation, amalgamation, electro-static, or magnetic), cyanidation, leaching, crystallization, precipitation (but not including as an ordinary treatment process electrolytic deposition, roasting, thermal or electric smelting, or refining), or by substantially equivalent processes or combination of processes used in the separation or extraction of the product or products from the ore, including the furnacing of quick-silver ores."

It is apparent that the Congress intended not to limit the computation of the percentage depletion allowance to the gross income attributable to purely extractive processes, for the deposit when thus first extracted might not be in a commercially marketable form, and might require further processing. Congress accomplished this by providing for the first time a general formula, and by giving nonexclusive illustrations of processes included in the phrase "ordinary treatment processes". See § 3797(b) of the Code of 1939, 53 Stat. 470. The general formula, which of course is controlling, is that the basis for computing the percentage depletion allowance shall be the "gross income from mining", defined as including "not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products." Thus we must look to see what processing is normally undertaken by a mine owner or operator in order to obtain a commercially marketable product, and when such a salable product is obtained, then the gross income from the sale of such product is the base upon which to apply the percentage depletion allowance. That these "ordinary treatment processes" are not necessarily limited to those processes which leave the extracted deposit in its natural state is clear from the inclusion, as an illustration in § 114(b) (4) (B), of the process of furnacing quicksilver ores, which involves a chemical change.

■ It would also be helpful, in a preliminary way, to observe that the depletion allowance is not an allowance upon any *process,* whether a mining process or a manufacturing process. Nor is it an allowance, as such, upon any product. Instead, it is an allowance to the mine owner designed as a simple means to diminish his taxable income from the exploitation of a natural resource which is necessarily exhausted in the process. In making this allowance, the Congress has elected not to limit the deduction in all cases to the taxpayer's actual cost or other basis in the land from which the ore or mineral is extracted. To supply a simpler rule, the Congress has turned more and more to the method of percentage depletion, which differs from both cost and discovery value depletion in that it is measured by an arbitrary percentage of gross income from the property, without regard to the taxpayer's cost or discovery value.

From the foregoing it is clear that by the enactment of 1943 the Congress for the first time introduced into the statute key language which had not theretofore appeared either in the statute or in the regulations thereunder, namely, a new definition of "gross income from mining" as including "not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products." Notwithstanding this, the Commissioner has subsequently sought, by regulatory amendments to § 29.23(m)–1(f) of Treas.Reg. 111, in cases where the mine owner customarily had to indulge in further processing other than merely extractive operations before obtaining a commercially marketable product upon which he could realize any income, to prescribe a relatively complex mathematical method for calculating the percentage depletion base. This would require an allocation of income derived from the sale of the first marketable product to the various treatment processes in proportion to their

cost, with only those processes allowed as part of the base which occurred before any chemical change had taken place in the extracted mineral.

By § 319 of the Revenue Act of 1951 (65 Stat. 497), the Congress amended § 114(b) (4) (A) of the Internal Revenue Code so as to extend the availability of percentage depletion for the first time to "calcium carbonates," which includes deposits of cement rock, the natural resource involved in the case at bar. The prescribed percentage for calcium carbonates was ten per cent of the gross income from mining the deposit.

With the foregoing stated by way of background, it will perhaps be easier to understand the significance of the facts in the present case.

Throughout the tax period in question, Lawrence Portland Cement Company, the taxpayer-appellant's predecessor, owned and operated two quarries, one in Maine and the other in Pennsylvania, from which it extracted cement rock, a calcium carbonate suitable for conversion into cement. The operations began with drilling and primary blasting from the face of the quarry by the open pit method to obtain the cement rock, which was then broken into manageable size by secondary blasting and loaded by shovels into dump trucks which carried it to an inclined railway where it was deposited into dump rail cars for transportation to the near-by plant.

Treatment or "beneficiation" then occurred at the plant in the following processes: The dump rail cars deposited the cement rock into a large primary crusher, which reduced the size of the extracted rock to pieces with a maximum dimension of about eight inches. After this primary crushing, the cement rock fell onto a conveyor belt which carried it to a secondary crusher which further reduced the size of the rock. From the secondary crusher a conveyor belt carried the cement rock to a shed, from which it was picked up by an overhead crane which deposited the desired quantities into a hopper, over which a coarse bar grate was fitted to screen the crushed cement rock. From the hopper, the screened cement rock was gravity-fed to a ball mill where it was ground with water to a proper fineness known as "slurry," which was then conveyed to a wet "slurry" tank where it was kept in suspension by a revolving paddle mechanism. The "slurry" was then run off to filters where much of the water was removed, and the resulting filter cake was thereafter conveyed by belt to rotary kilns.

There is no dispute that the gross income allocable to the operations thus far described may be included in determining the gross income from mining of the mineral, cement rock, for the purpose of calculating the base to which the allowable percentage depletion is to be applied. But it was found as a fact by the trial court, and we understand that this is not controverted by the government, that except in negligible amounts, which may be disregarded, "there is no commercial market for cement rock. The first commercially marketable product is cement. The methods used by taxpayer to transform cement rock into cement are admitted to be the 'ordinary treatment processes normally applied by mine owners or operators' who produce cement."

Accordingly, the taxpayer's predecessor had to engage in further processes before obtaining a marketable product, cement, upon which gross income could be realized. The so-called filter cake was run into the upper end of rotary kilns, which were in the form of long rotating cylinders set at a slight inclination, the filter cake gradually traveling toward the lower end of the kiln. Hot gases from a flame at the lower end evaporated the water from the filter cake and burned the remaining material to a dense clinker. The clinker was then conveyed to a grinding mill where it was ground to the fineness of cement; the cement was finally placed in silos from which it was loaded and shipped in bags or in bulk. It is conceded that these last processes effected a chemical change in the cement rock, transforming it from its crude min-

eral state into cement, which is synthetic and not a mineral.

The dispute here involves the propriety of including income allocable to the kiln and post-kiln processes in gross income from mining, as defined; if such processes are excluded, the depletion allowance for the taxable period would be $204,859.19, whereas, if such processes are included, the allowable depletion would be $795,852.60.

It is contended by the government that mining terminated, and that the depletion base was arrived at, when the mine operator had prepared the cement rock for conversion, and that the subsequent operations, during which it underwent a chemical change and ceased to be a mineral, constituted a manufacturing process, not allowable in computing the depletion base. As indicated above, this contention is fully supported by Treas. Reg. 111, § 29.23(m)–1(f), but the taxpayer maintains that the regulation is invalid in this respect because the definition of "gross income from mining", inserted in § 114(b) (4) (B) in 1943, does not permit such an interpretation, but on the contrary compels the opposite result. Although the district court upheld the government's view, we find ourselves in agreement with the taxpayer.

Preliminary to upholding the government's asserted interpretation, the district court concluded that the statutory language, "commercially marketable mineral product or products", was intrinsically ambiguous. One possibility, the district court said, was to construe the phrase as permitting the depletion allowance to extend to a product of a mineral, although the end product may be a synthetic nonmineral (viz., a commercially marketable mineral product). The second possibility, said the district court, was to construe the statutory phrase as restricting the depletion allow-

ance to products still in a mineral state (viz., a commercially marketable mineral product).

We are unable to perceive that the statutory language contains any such inherent ambiguity. In this connection it should be observed that three other courts of appeals which have had occasion to weigh the government's arguments advanced in the case at bar, and to construe the critical statutory phrase, have held it to be "clear and unambiguous" in favor of the taxpayer's interpretation. See United States v. Cherokee Brick & Tile Co., 5 Cir., 1955, 218 F.2d 424, 425; Townsend v. Hitchcock Corp., 4 Cir., 1956, 232 F.2d 444, 446; United States v. Sapulpa Brick & Tile Corp., 10 Cir., 1956, 239 F.2d 694, 697. We are not persuaded that we ought to create a conflict with our brethren in other courts of appeals with respect to this matter.

In the first place it should be noted that cement has been consistently classified as a "mineral product" both in scholarly compilations of a general sort, such as the Encyclopedia Britannica,[2] and in publications of specialized government agencies which compile information and statistics on the mining industry. Such classification has been made by the Bureau of Mines and the Bureau of the Census, both of which had listed cement as a "mineral product" at the time the statutory definition of "gross income from property" was enacted in the Revenue Act of 1943,[3] and this classification has been continued in the latest publications of these agencies.[4]

Furthermore, it is well known that the word "mineral" is frequently used before other words to describe products which are manufactured from minerals but which are not themselves composed of minerals in the natural state. In such usage it qualifies the noun which follows

2. 22 Encyc. Britannica 753, Table XIII (1954).

3. Minerals Yearbook for 1942, pp. 38, 45, 48 (1943); Statistical Abstract of the United States, 1942, p. 845. In addition, the Statistical Abstract statistics as to

production of cement (pp. 879, 888) appear in a section entitled "Mining and Mineral Products."

4. Minerals Yearbook for 1953, vol. 1, p. 20 (1956); Statistical Abstract of the United States, 1956, pp. 732, 743.

and indicates mineral origin; for example, "mineral wool" is a generic term which can be applied to various insulation products manufactured from minerals.[5] The dictionary furnishes many similar examples.[6]

The legislative history of § 114(b) (4) (B) provides additional support for the interpretation of the statutory definition which we, along with other courts of appeals, have adopted. In order to support its conclusion that cement is not a "mineral product" within the meaning of the statutory definition, the district court seized upon the word "mineral" as the crucial word in the phrase "the commercially marketable mineral product or products." However, that "mineral" is not the crucial word is made clear by the Senate Finance Committee Report which explained the meaning of the section added by that committee to the Revenue Act of 1943:

> "The purpose of the provision is to make certain that the ordinary treatment processes which a mine operator would normally apply to obtain a *marketable product* should be considered as a part of the mining operation, and to give reasonable specification of what are to be considered such processes for various kinds or classes of mines." (Italics added.) Sen.Rep. No. 627, 78th Cong., 1st Sess., 23, 1944 Cum.Bull. 991.

In other words, although the draft of the bill to which the above report referred contained the word "mineral" and the phrase was in the same form as in the final Act, the committee did not even use the word "mineral" in explaining that the purpose of the statutory provision was to make certain that the ordinary treatment processes which a mine operator would normally apply to obtain a marketable product should be considered as a part of the mining operation, as defined.

Nor can we accept the government's contention that the Congress in 1943 was concerned solely with making clear that concentration processes, equivalent to those which had previously been listed in the applicable regulations, were intended to be included as a part of the mining operation, for in defining "gross income from mining" the Congress introduced new language which had never previously appeared in the history of the depletion allowance. Furthermore, the Senate Finance Committee Report which explained the provision gave no hint that Congress intended only to include such "equivalent concentration processes". Quite the contrary, as the previous quotation shows, the committee report stated that the purpose of the new provision was "to make certain that the ordinary treatment processes which a mine operator would normally apply to obtain a marketable product should be considered as a part of the mining operation".[7]

For the reasons above indicated, we conclude that the taxpayer is entitled to a percentage depletion deduction based upon its gross income from cement, as the first commercially marketable min-

---

5. 9 Kirk & Othmer, Encyc. of Chemical Technology 122 (1952).

6. E. g., *mineral oil*, "Any oil of mineral origin, as petroleum, shale oil, or any oil *obtained from them by refining*"; *mineral water*, "Any water naturally or *artificially* impregnated with mineral salts or gases"; *mineral jelly*, a "semisolid substance *from petroleum* * * * used as a stabilizer in explosives"; *mineral spirits*, a "volatile petroleum product, intermediate between gasoline and kerosene, used extensively as a thinner for paints and varnishes"; *mineral rubber*, which includes "an asphalt *artificially* obtained or treated." (Italics added.)

Webster's New International Dictionary, Unabridged (2d ed. 1953).

7. It should also be observed that the government's position is subject to the anomaly that under its interpretation there never is a "commercially marketable mineral product" obtained from cement rock. Thus, to be perfectly consistent, "mining" under § 114(b) (4) (B) would not include any "ordinary treatment processes" applied to cement rock, since mining includes only "ordinary treatment processes" applied to obtain the "commercially marketable product or products."

**520**

eral product obtained from the deposit, calcium carbonate, after the ordinary treatment processes normally applied by such mine owners. To the extent that § 29.23(m)–1(f) of Treas.Reg. 111 is inconsistent with this conclusion, it must be declared to be invalid. See Manhattan General Equipment Co. v. Commissioner, 1936, 297 U.S. 129, 134, 56 S.Ct. 397, 80 L.Ed. 528.

A judgment will be entered vacating that portion of the judgment of the District Court now under review, and remanding the case to the District Court for further proceedings not inconsistent with this opinion.