**COMMISSIONER OF INTERNAL REVENUE, Petitioner,**

v.

**IOWA LIMESTONE COMPANY, Respondent.**

**No. 16093.**

United States Court of Appeals
Eighth Circuit.

July 10, 1959.

Marvin W. Weinstein, Washington, D. C. (Howard A. Heffron, Acting Asst. Atty. Gen., and Lee A. Jackson and Melva M. Graney, Attys., Dept. of Justice, Washington, D. C., were with him on the brief), for petitioner.

James Evans Cooney, Des Moines, Iowa (Bannister, Carpenter, Ahlers & Cooney, Des Moines, Iowa, was with him on the brief), for respondent.

Before SANBORN, VOGEL and VAN OOSTERHOUT, Circuit Judges.

VAN OOSTERHOUT, Circuit Judge.

The Commissioner of Internal Revenue has filed timely petition for review of the decision of the Tax Court (opinion reported 28 T.C. 881) rejecting his contention that the taxpayer owes additional income tax for the years 1950 [1] and 1951 by reason of claiming more percentage depletion than it was entitled to under section 114(b) (4) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 114(b) (4).[2]

The principal question presented is the amount of percentage depletion allowable to the taxpayer upon the pulverized chemical grade limestone it mines and processes. More particularly, the problem is the product base upon which the percentage depletion is to be computed. The Commissioner contends the depletion must be computed upon a base measured by the gross income from crushed limestone. Taxpayer contends that it is

---

1. The 1950 tax is involved only by virtue of an unused excess profits tax credit carryback from 1951.

2. All statutory references in this opinion are to the Internal Revenue Code of 1939, as amended.

entitled to compute its depletion upon the basis of its gross income from pulverized chemical grade limestone, which it contends is its first commercially marketable product.

The Tax Court, after hearing the evidence, made findings of fact as follows:

"The first commercially marketable product produced by petitioner from its limestone was finely ground or pulverized calcium carbonate, at least 95 per cent pure, free from toxic impurities, and containing not more than one per cent moisture.

"The processes of original quarrying, crushing, heat treatment to remove moisture, and pulverization, which petitioner applied to arrive at its product, were ordinary treatment processes normally applied by mine owners to obtain the commercially marketable product."

Based upon such findings, the Court determined that the taxpayer was entitled to compute its percentage depletion upon the basis of gross income derived from its finished product, except for the cost of chemicals added and the cost of bagging, which costs taxpayer had deducted from gross income in establishing its base for percentage depletion.

There is no real dispute as to the pertinent facts. Taxpayer is an Iowa corporation engaged in the business of quarrying and processing chemical grade limestone. The quarry is located at Alden, Iowa. The processing plant is adjacent to the quarry. Taxpayer's limestone has a calcium carbonate content of over 95 per cent with a low percentage of impurities. It qualifies as chemical grade limestone.[3] The Tax Court in its opinion states:

"Dr. H. Garland Hershey, Director and State Geologist of the Iowa Geological Survey, in a report dated December 11, 1953, stated that petitioners' limestone had the highest percentage of calcium carbonate and the lowest impurity content of any limestone tested, except one near Gilmore City, Iowa, and is available near the surface over a very small area as compared to the total exposed area of all other limestone in Iowa."

In the midwest there are more than a thousand quarries producing agricultural limestone and about six hundred producing stone used for building and road purposes, but there are less than a dozen quarries producing chemical grade limestone.

The Tax Court fairly summarized taxpayer's method of producing its product, as follows:

"The processes employed by petitioner consist of stripping the overburden, and blasting the face of the quarry with explosives in drill holes. The broken limestone is loaded in trucks and hauled to the primary crusher which reduces it to varying sizes from a tennis ball to a football or basketball. The large pieces are carried into the plant where a secondary crushing in hammer mills takes place. The limestone is then conveyed into roller mills which process the material, and the moisture is removed by hot air from furnaces being forced through the roller mills. The limestone is drawn by air stream from the top of the roller mills by a series of collectors. Part of the finely processed limestone is treated with chemicals, such as iodine, upon specifications of particular customers. Both the chemically treated and untreated pulverized limestone is packaged in 50 and 100 pound paper bags. A part of the processed product is shipped in bulk by loading in tank cars on petitioner's spur track. The introduction of air, heated to about 400 degrees, merely re-

---

3. At the trial an issue was raised as to whether taxpayer's stone was chemical grade limestone. The Commissioner in his brief specifically states that he does not contest the Tax Court's finding that taxpayer's limestone is chemical grade limestone.

moves the moisture and does not cause any chemical change."

The taxpayer's plant was constructed to produce pulverized chemical grade limestone. The stone at the time it enters taxpayer's plant after primary crushing is not commercially marketable for any purpose. There is no place in the plant where the material can be withdrawn after it has started its journey through the plant. Samples taken after the hammer mill operation in the plant indicate that the stone is not sufficiently crushed at that stage to be commercially marketable for any purpose. The available market for taxpayer's product is feed and mineral manufacturers. All purchasers insist that the stone be finely ground, contain at least 95 per cent of calcium carbonate, be free from toxic impurities, and contain less than 1 per cent moisture. There is no demand for chemical grade limestone for chemical purposes except in the fully processed finely ground form produced by the taxpayer.

All of the taxpayer's product except an insignificant amount of dirty, contaminated stone, sold to a county for road purposes, was sold in its fully processed form. There is a market for limestone for road rock and agricultural purposes in a crushed form, but there is no demand for chemical grade limestone in that form. While taxpayer's plant as constructed does not produce limestone satisfactorily crushed for road or agricultural purposes, the plant could be converted to do such crushing.

■ The right of the taxpayer to a percentage depletion allowance is unchallenged. The depletion allowance is a matter of legislative grace. The deduction is intended as compensation for capital assets consumed in the production of income through the severance of minerals. Anderson v. Helvering, 310 U.S. 404, 60 S.Ct. 952, 84 L.Ed. 1277. An interesting discussion of the purpose and development of the percentage depletion legislation is found in Dragon Cement Co. v. United States, 1 Cir., 244 F. 2d 513. The scope of the depletion de-

duction is governed solely by the statutes authorizing the deduction. Our problem is largely one of statutory interpretation. We now look to the controlling statutes.

Section 23(m), 26 U.S.C.A. § 23(m), authorizes the deduction from gross income from mining of "a reasonable allowance for depletion * * * according to the peculiar conditions in each case * * *." The statutory provision authorizing percentage depletion for minerals is section 114(b) (4), which reads in part:

"* * * * *Percentage depletion for coal and metal mines and for certain other mines and natural mineral deposits.*

"(A) *In general.* The allowance for depletion under section 23(m) in the case of the following mines and other natural deposits shall be—

"* * * * * *

"(iii) in the case of * * * chemical grade limestone * * * 15 per centum,

* * * * * *

of the gross income from the property during the taxable year * * *."

Section 114(b) (4) (B) defines "gross income from property" as being "gross income from mining," and defines the word "mining" as used therein "to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products." As to some ores and minerals the statute describes ordinary treatment processes, but such processes are not enumerated with reference to chemical grade limestone and many other minerals.

In the Dragon Cement Co. case, supra, the court points out that section 114(b) (4) (B) lays down the formula which provides that "the basis for computing the percentage depletion allowance shall be the 'gross income from mining,' defined as including 'not merely the extraction of the ores or minerals from the ground but also the ordinary treatment

processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products.'" With reference to the application of the formula, the court states at page 516 of 244 F.2d:

"* * * Thus we must look to see what processing is normally undertaken by a mine owner or operator in order to obtain a commercially marketable product, and when such a salable product is obtained, then the gross income from the sale of such product is the base upon which to apply the percentage depletion allowance. That these 'ordinary treatment processes' are not necessarily limited to those processes which leave the extracted deposit in its natural state is clear from the inclusion, as an illustration in § 114 (b) (4) (B), of the process of furnacing quicksilver ores, which involves a chemical change."

■ Courts in interpreting section 114(b) (4) (B) have uniformly held that the formula prescribed by the statute is clear and unambiguous, and that the depletion base to be used is the sale price of the first commercially marketable mineral product or products, provided that the processes applied, which are of a manufacturing nature rather than a mining nature, are the processes normally applied by mine owners to obtain the commercially marketable product. Thus, in Cannelton Sewer Pipe Co. v. United States, 7 Cir., 268 F.2d 334, decided June 15, 1959; United States v. Sapulpa Brick and Tile Corporation, 10 Cir., 239 F.2d 694, and United States v. Cherokee Brick & Tile Co., 5 Cir., 218 F.2d 424, it was held that brick and tile were the first commercially marketable products from clay and shale mines. Dragon Cement Co., supra, holds manufactured cement is the first commercially marketable product from cement rock. New Idria Quicksilver Mining Co. v. Commissioner of Internal Revenue, 9 Cir., 144 F.2d 918, holds that mercury is the first commercially marketable product from cinnabar.

Centropolis Crusher Co. v. Bookwalter, D. C.W.D.Mo., 168 F.Supp. 33, a case factually very similar to our present case, holds that finely crushed and ground limestone in eight different graded sizes is a first commercially marketable product from chemical grade limestone. Riverton Lime and Stone Co. v. Commissioner of Internal Revenue, 28 T.C. 446, holds that hydrated hydraulic lime, which sold for $19.20 per ton, is the first commercially marketable product from the limestone mine, although there was demand for agricultural limestone in the vicinity of the mine.

In many of the cases just cited the Commissioner had urged that the manufacturing processes could not constitute part of the "ordinary treatment processes." The Commissioner does not make such argument here, but states that the cases just discussed are not controlling because in most of said cases the Government conceded that the product of the mine before the manufacture stage was not commercially marketable. In our present case, the Government strongly urges that crushed limestone after the hammer mill process and before pulverization is commercially marketable for road or agricultural purposes. A similar argument was made to the Seventh Circuit in the Cannelton Sewer Pipe Co. case, supra, and was rejected. In that case the minerals were clay and shale. While the evidence showed that there was a market for these products, the court found that the price that the taxpayer could get for its clay and shale would be less than its production costs, and hence concluded the clay and shale were not commercially marketable. The court states:

"We agree with the taxpayer that it did not have a *commercially* marketable product in its fire clay and shale. We are unable to accept the theory that a taxpayer's depletion allowance is to be computed on the basis of a representative market or field price for a product which taxpayer could not sell at a profit. To

do so would be to deprive of all meaning the words 'commercially marketable' as used in the Code provision here considered. The integrated operations of taxpayer in this case (that is, combined mining and manufacture) were certainly not unique. The evidence the Government used to establish the existence of a market for taxpayer's fire clay indicates, in fact, that the integrated miner-manufacturer was the rule rather than the exception in Indiana, in 1951. The fact that certain operators of strip mines found it economically feasible to extract and sell fire clay primarily in a limited area near Brazil, Indiana does not alter this picture. Finally, there is no contention that taxpayer applied other than ordinary treatment processes in obtaining its finished products."

In Sparta Ceramic Co. v. United States, D.C.N.D.Ohio, 168 F.Supp. 401, 404, the court discusses and defines "commercially marketable" as follows:

"Taxpayer equates 'commercially marketable' with 'economically feasible', and adopts the view that before a product is commercially marketable there must be the prospect of substantial sales with the possibility of a profit being made thereby.

"The Government's theory on the definition of this term is that it means only salable or fit to be offered for sale in business intercourse.

"Both logic and the decided cases support the taxpayer's interpretation.

"Webster's New International Dictionary (2nd Ed.) defines 'commercial' as:

" '1. Of or pertaining to commerce * * *

" '2. Having financial profit as the primary aim'.

" 'Marketable' is defined as:

" '1. Fit to be offered for sale in a market; * * *

" '2. Wanted by purchasers, saleable; * * *'

"Thus, 'marketable' can be said to be 'saleable, or fit to be offered for sale in a market', which is exactly the definition the Government wishes to ascribe to 'commercially marketable'. The fallacy of this desired interpretation is the failure to include the profit making aspect, 'commercial'."

In Riverton Lime & Stone Co. v. Commissioner of Internal Revenue, supra, the Tax Court states at page 452 of 28 T.C.:

" * * * We think 'commercially marketable' means that there is commerce or trade in a mineral product and that there is an established market in which such product is sold. Here there was neither so far as this particular crushed limestone was concerned. But, even in the face of those facts, the respondent argues that because the crushed stone which the petitioner produced *could* have been used for agricultural purposes, it must compute its allowable depletion on the theoretical gross income supposedly derived from the sale of the crushed stone. It seems to us that the effect of that argument is to read the words 'commercially marketable' out of the statute."

We believe that the profit-making aspect must be given consideration in determining whether a mineral product is commercially marketable. As previously stated, taxpayer had a relatively rare and special type of limestone suitable for chemical use. It had the right to market its chemical grade limestone for the purpose for which it was most suited and in a field where it would command a fair price. Gold, silver, and iron ores and other valuable minerals could doubtless be sold for road rock, fill, or ballast, but no one would contend that their value must be determined upon such a limited use of such products. It was not economically feasible for the taxpayer to market its superior stone as

404

ordinary road rock. Many kinds of cheap stone would equally serve such a purpose.

The Government also contends that the only relevant product of any mining industry in which a taxpayer is engaged is the first commercially marketable product of that industry, and that such product in the limestone field is crushed limestone, regardless of the use to which the stone may be put. This argument was properly rejected by the Tax Court. In response to a similar argument, the Seventh Circuit in Cannelton Sewer Pipe Co., supra, states:

"* * * The short answer to this is that we do not agree that it was intended that the depletion allowance for each mineral be reduced to the common denominator represented by a conceivable product most cheaply produced from each mineral. In United States v. Cherokee Brick & Tile Company, supra [5 Cir., 218 F.2d 424], and United States v. Sapulpa Brick and Tile Corporation, supra [10 Cir., 239 F. 2d 694], the Fifth and Tenth Circuits, respectively, allowed depletion on both *brick* and *tile*. In Townsend v. Hitchcock Corporation, supra [4 Cir., 232 F.2d 444], both *talc powder* and *talc crayons* were treated as depletable products."

We believe that the conclusion reached by the Seventh Circuit is supported by the authorities it cites, and that the court properly interpreted the depletion statute.

We do not think that the depletion statute contemplates that all types of limestone be considered the same mineral. This was apparently the Tax Court's thought when it stated:

"Limestone is divided commercially into three large fields, i. e., chemical and manufacturing industries, building industries, and agriculture. * * *"

4. Regulations 118 are effective only to taxable years commencing after December 31, 1951, and were not in effect for the taxable years here involved. The

The foregoing statement is fully supported by the evidence. Chemical grade limestone must meet rigid specifications. A very small proportion of limestone meets such specifications. Specifications for agricultural and building stone are much less exacting. Section 114(b) gives different treatment to various types of limestone. Limestone used for building is classified as stone and is given a 5 per cent depletion rate (§ 114(b) (4) (A) (i)); calcium carbonate carries a 10 per cent rate (§ 114(b) (4) (A) (ii)); and chemical grade limestone carries a 15 per cent rate (§ 114(b) (4) (A) (iii)).

Section 39.23(m)–5(b), Regulations 118,[4] provides in part:

"§ 39.23(m)–5. Computation of depletion based on percentage of income in case of certain mines or other natural deposits.

* * * * * *

"(b) For the purposes of this section, the minerals indicated below shall have the following meanings:

* * * * * *

Calcium carbonate * * * Miscellaneous limestones and other calcium carbonate rocks (not specifically provided for at a 5 percent or 15 percent rate of percentage allowance) such as cement rock and limestone used or sold for use in soil treatment. This classification does not include rock or minerals used or sold for use as ballast, road making, concrete aggregates, or other purposes for which chemical composition is not a major requirement.

* * * * * *

Limestone, chemical grade * * * Limestone used or sold for use in the chemical trades."

The record shows that crushed limestone used for agricultural and road purposes brings $1.35 to $1.75 per ton.

regulations, however, interpret the same section of the Internal Revenue Code of 1939 we are here considering.

The Government contends the taxpayer gets $9.00 per ton for its product. Thus, it would appear that the taxpayer receives some five times as much for its finished product as it would have received if it had sold it in a crushed stage. The breakdown on the increased cost of processing the stone from the crushed stage to the pulverized stage is not readily ascertainable from the record. It is, however, clearly apparent that the increased cost of the additional processing represents only a minor fraction of the higher price received by the taxpayer for its product. The greater part of the higher price received appears to be attributable to the superior quality and relative scarcity of the chemical grade limestone. We find nothing in the percentage depletion statute which compels the conclusion that the depletion base for the taxpayer is limited to the gross income that would have been produced by the sale of the crushed product of an inferior and more plentiful limestone which is not adaptable to chemical uses.

The Commissioner also argues that to give the taxpayer a greater depletion base than owners of inferior limestone quarries would be inequitable. At least as good an argument can be made that it would be unfair to the taxpayer not to allow it depletion based upon the reasonable consideration of the value of its depletable product. However, such arguments have no weight either way as the depletion base is controlled entirely by the statute. Any inequities call for legislative rather than judicial action.

The Commissioner expresses some fear that the logical result of the Tax Court's holding is that a miner can use as his depletion base the gross sale price of any product he chooses to manufacture. Such fear is without foundation. The depletion statute as interpreted by the Tax Court limits the depletion allowance to the first commercially marketable chemical grade limestone produced. This is manifest by the court's determination that the costs of bagging and chemical additives should be excluded in computing the depletion base. For depletion purposes the product may not be processed beyond the stage where it becomes a commercially marketable product. Cannelton Sewer Pipe Co. v. United States, supra; Sparta Ceramic Co. v. United States, supra.

 The evidence fully supports the fact findings of the Tax Court that the first commercially marketable product in the chemical grade limestone field is the finely ground limestone produced by the taxpayer, and that the processes employed by the taxpayer to arrive at its product were the ordinary treatment processes normally applied by mine owners to obtain such product. Such findings support the court's conclusion that the taxpayer is entitled to use as its depletion base the gross income from the sales of its pulverized chemical grade limestone except for the costs of blending of chemicals and bagging. The percentage depletion is also, of course, subject to the statutory limitation that it shall not exceed 50 per cent of the net income of the taxpayer.

The Commissioner makes an additional contention, covering two pages of his brief, that all costs of bagging and chemical additives were not excluded in determining the depletion base. The claim apparently is that, while costs of bags and chemicals were deducted, a proportionate share of labor costs, depreciation, operating expenses, and overhead should be allocable to these processes by reason of section 29.23(m)–1(f), Regulations 111. This question was raised in the Tax Court in connection with motion for reconsideration and the Rule 50 Computation. The Commissioner in his brief cited no authority in support of his additional contention, other than the regulations, and has failed to point out any fact supporting his contention that the Tax Court erroneously computed the depletion base. The burden is upon the Commissioner as petitioner to demonstrate that error has been committed. This he has failed to do.

Affirmed.