**LEHIGH PORTLAND CEMENT COMPANY**

v.

**UNITED STATES of America, Appellant.**

**Nos. 14584–14586.**

United States Court of Appeals Third Circuit.

Argued March 12, 1964.

Decided June 17, 1964.

Order July 1, 1964.

Michael A. Mulroney, Washington, D. C. (C. Moxley Featherston and John B. Jones, Jr., Acting Asst. Attys. Gen. Lee A. Jackson, Melva M. Graney, Attys., Dept. of Justice, Washington, D. C., Drew J. T. O'Keefe, U. S. Atty., of counsel, on the brief), for appellant.

Joseph B. Brennan, Atlanta, Ga. (Arthur Littleton, Philadelphia, Pa., Edward W. Hyland, Allentown, Pa., Willis B. Snell, Washington, D. C., Morgan, Lewis & Bockius, Philadelphia, Pa., Sutherland, Asbill & Brennan, Atlanta, Ga., of counsel, on the brief), for appellee.

Before BIGGS, Chief Judge, and HASTIE and SMITH, Circuit Judges

HASTIE, Circuit Judge.

In the district court the taxpayer, Lehigh Portland Cement Co., obtained a judgment for the refund of income and excess profits taxes which it had paid pursuant to allegedly erroneous assessments for the taxable years 1951, 1952 and 1953. The United States has appealed.

The taxpayer manufactures cement, using as a principal ingredient limestone from its own quarries. Under section 23(m) of the 1939 Internal Revenue Code, as applicable to the taxable years, it was entitled to a percentage deduction from gross income for depletion of these limestone deposits. The sole question here is whether the taxpayer's limestone qualifies as "chemical grade limestone", for which section 114(b) (4) (A) (iii) of the Internal Revenue Code authorizes a 15 per cent depletion allowance, or only as "calcium carbonates" for which the immediately preceding subsection allows a 10 per cent deduction. The district court, disagreeing with the Commissioner's decision upon this issue, held that the mineral in suit is "chemical grade limestone" within the meaning of the statute.

Calcium carbonate in varying amount is the principal ingredient of limestone, which also contains smaller amounts of

magnesium carbonate, silica and other substances. The percentage by weight of various ingredients constituting the limestone extracted from each of the taxpayer's ten quarries involved in this appeal appears in the following table:

### TYPICAL CHEMICAL ANALYSIS [1]

Percentages

| Quarry | Calculated $CaCO_3$ | Calculated $MgCO_3$ | Total Carbonate | $SiO_2$ | $Al_2O_3$ | $Fe_2O_3$ |
|---|---|---|---|---|---|---|
| Alsen, N. Y. .......... | 78 | 2.0 | 80.0 | 14.7 | 1.9 | 1.7 |
| Birmingham, Ala. .... | 85 | 4.0 | 89.0 | 7.4 | 2.6 | 1.0 |
| Fogelsville, Pa. ...... | 76 | 5.6 | 81.6 | 13.7 | 3.2 | 1.2 |
| Fordwick, Va. ........ | 87 | 2.3 | 89.3 | 7.9 | .69 | .74 |
| Iola, Kansas ........ | 84 | 6.3 | 90.3 | 6.6 | 2.0 | 2.0 |
| Metaline Falls, Wash. .. | 82 | 3.3 | 85.3 | 9.4 | 4.2 | 1.0 |
| Mitchell, Ind. ........ | 89 | 4.2 | 93.2 | 5.0 | .54 | .65 |
| Oglesby, Ill. .......... | 82 | 2.3 | 84.3 | 10.5 | 2.8 | 1.3 |
| Ormrod, Pa. ......... | 76 | 4.4 | 80.4 | 15.2 | 3.5 | 1.3 |
| Sandt's Eddy, Pa. ..... | 74 | 5.0 | 79.0 | 15.9 | 3.5 | 1.3 |

1. Very small quantities of various impurities are omitted.

It will be observed that all but two of the quarries yield limestone containing less than 85 per cent calcium carbonate and less than 90 per cent total (calcium and magnesium) carbonates. The highest total carbonate content, 93.2 per cent, is found in the limestone from the taxpayer's Mitchell, Indiana quarry.

In terms of its principal ingredient, limestone of every grade is calcium carbonate. Indeed, limestone is by definition a rock containing more than 50 per cent mineral calcium carbonate. It is the government's position that only such limestone as contains more than 95 per cent total carbonates, or, conversely, less than 5 per cent of "impurities", qualifies as "metallurgical grade" or "chemical grade" limestone as those phrases are used in section 114(b) (4) (A) (iii) to define that mineral for which a 15 per cent depletion allowance may be taken. The government relegates less "pure" limestone to the more general, and for tax purposes less advantageous, category of "calcium carbonates".

The taxpayer approaches the problem of classification in a different way. It says that any limestone is of "chemical grade" if it is suitable for a commercial use in which it undergoes some chemical reaction, and that the taxpayer so uses its limestone. Thus, in the taxpayer's manufacture of cement, the raw materials are heated in kilns where the limestone undergoes chemical reactions and changes essential to the transformation into cement. Later, the cement, mixed with aggregates and water, functions as a chemically reactive agent to produce concrete.

To resolve this controversy and to determine what Congress meant by "chemical grade limestone", we have examined the legislative history of the subsection in question. The proposal to authorize a 15 per cent depletion allowance for "metallurgical grade" and "chemical grade" limestone was submitted with justifying testimony at the congressional hearings on the 1950 amendments to the Internal Revenue Code and was adopted by the House of Representatives, but not by the Senate. Further hearings in 1951 resulted in the enactment of this amendment in the Revenue Act of 1951,

c. 521, sec. 319(a), 65 Stat. 452. Its proponents were representatives of the National Lime Association. The basic justifying document introduced at both the 1950 and the 1951 hearings was a survey report by Professor Kenneth Landes. 1 House Hearings, Revenue Revision of 1950, 338; 3 House Hearings, Revenue Revision of 1951, 1555.

The report begins with a discussion of the composition and grades of limestone, pointing out that the greater the calcium carbonate content, the higher the grade or quality of the limestone. It is stated that the only grades of limestone "satisfactory for metallurgical or chemical use" are those which contain not more than 4.6% of "impurities". Silica, alumina and sulfur are classified as principal "impurities" in limestone.

The report lists the principal specific uses for which these high grades of limestone are required as "blast-furnace flux" in the conversion of iron ore into pig iron, "furnace lining" in the manufacture of steel, "lime burning and chemical manufacture". Apart from use for lime making, "chemical stone" is characterized as that which is "used in making such products as soda ash and calcium carbide, and in the refining of beet sugar".

The report then contrasts this relatively pure and high grade limestone with the estimated ⅔ of the national limestone product which is unsuitable for the above-mentioned uses but is satisfactory "for concrete aggregate, road metal, railroad ballast, agricultural limestone, cement manufacture and other purposes where chemical purity is not essential". Moreover, at the 1951 House hearings, Phillip Corson, a lime manufacturer, told the House committee, that the 15 per cent depletion allowance was sought only for "the small percentage of available limestone which meets the metallurgical and chemical grade requirement". p. 1567. This statement was supported by testimony at the 1950 hearings that only 5 per cent of our national limestone reserve is of this high quality. p. 336. Finally, in concluding the testimony at the 1951

hearings, Ralph Dickey, a representative of the National Lime Association, advised the committee that deposits of "metallurgical and chemical grade limestone * * * are much scarcer than coal deposits and are being depleted much more rapidly". He concluded that since "Congress has * * * provided such [depletion] allowance for natural resources certainly no more critical in the economy than high grade limestone, we respectfully request that a percentage depletion allowance be granted to metallurgical and chemical grade limestone at the rate of 15 per cent". p. 1551.

None of this testimony was challenged or contradicted. No one proposed that limestone other than grades of such purity and high carbonate content as the industry witnesses described be granted a 15 per cent depletion allowance. The witnesses made it clear that the "metallurgical and chemical grades" of limestone about which they were talking were the relatively scarce and very pure limestones which contained very little silica, alumina and sulfur, substances classified as impurities in this mineral. They showed that such high grade limestone was "metallurgical" in that one of its important uses occurs in the manufacture of pig iron and steel. They also showed that limestone of similarly high grade is "chemical" stone in that it is required for the manufacture of lime and such other chemicals as soda ash and calcium carbide.

Finally, they repeatedly stated that the mineral most suitable for cement is ordinary limestone of relatively low grade, preferably containing a substantial percentage of the impurity silica, which is needed in cement. They expressly excluded cement stone from the purer "chemical grade" required for the manufacture of such "chemicals" as lime, soda ash and calcium carbide. Any possible doubt about this must have been eliminated by the following interrogation of the witness Dickey by Congressman Jenkins during the 1951 hearings:

"MR. JENKINS. * * *

"Does the cement industry require this metallurgical and chemical grade of limestone?

"MR. DICKEY. No sir; it does not. They do not care how much silica or alumina there is in the limestone."

Since the phrase "chemical grade" limestone was first used in the 1950 bill and its restrictive meaning explained during hearings, and the same language was again incorporated in the 1951 legislation and again explained in the same way, we think Congress must have intended that the phrase have the restrictive connotation that the witnesses gave it. Had there been any suggestion to Congress that "chemical grade" meant suitable for any commercial use or process involving a chemical reaction, the legislative adoption of the phrase without definition would have been ambiguous. But there was no suggestion of such an alternative meaning. In these circumstances, we think it would be arbitrary to attribute to the critical phrase in the enacted statute a meaning significantly different from the one and only meaning that was clearly and repeatedly expressed throughout the legislative hearing.

■■■ We think the court below was right in concluding generally that "chemical grade limestone indicates a limestone of a higher degree of purity than its common commercial form". Indeed, the courts seem to agree upon this connotation. Bookwalter v. Centropolis Crusher Co., 8th Cir. 1962, 305 F.2d 27, 33; Rock Hill Quarries Co. v. United States, E.D. Mo.1963, 217 F.Supp. 324. However, we think the court erred in deciding that the taxpayer's limestone satisfied the statutory requirement. The product of each of the ten quarries in question contains substantially more than 5 per cent—eight of them, more than 10 per cent—of such impurities as silica, alumina and sulphur. Thus, it is not extraordinarily pure and is not suitable for the manufacture of lime or such chemicals as soda ash and calcium carbide. Therefore, it is not "chemical grade" within the meaning of the statute.

Most of the cases are in accord with this reasoning. E.g. Rock Hill Quarries Co. v. United States, supra; California Portland Cement Co. v. Riddell, S.D.Cal. 1958, 1959–1 U.S.Tax Cas. par. 9156; Dixie Products Co. v. United States, S.D. Fla.1957, 57–2 U.S.Tax Cas. par. 9933; Iowa Limestone Co., 1957, 28 T.C. 881, aff'd 8th Cir. 1959, 269 F.2d 398; but cf. Wagner Quarries Co. v. United States, N.D.Ohio 1957, 154 F.Supp. 655, aff'd. 6th Cir. 1958, 260 F.2d 907.

The judgment will be reversed.

ORDER

Upon consideration of the motion by appellee to amend this Court's judgment in the above entitled cases,

It is ordered that this Court's judgment of June 17, 1964 be and it hereby is amended to provide that the judgment of the District Court be reversed and the cases be remanded for the entry of judgment in accordance with the opinion of this Court.