ARVONIA–BUCKINGHAM SLATE COMPANY, Incorporated, Plaintiff,

v.

**UNITED STATES of America,**
**Defendant.**

**Civ. A. No. 2503.**

United States District Court
E. D. Virginia,
Richmond Division.

March 26, 1958.

John W. Riely, H. Brice Graves, Richmond, Va., for plaintiff.

R. R. Ryder, Asst. U. S. Atty., Richmond, Va., Ernest C. Friesen, Jr., Dept. of Taxation, Washington, D. C., for defendant.

STERLING HUTCHESON, Chief Judge.

The above entitled cause came on regularly for trial and the Court having duly considered the evidence and the post trial briefs filed by the parties and being fully advised in the premises now finds the following:

Findings of Fact

1. Plaintiff is a corporation organized under the laws of the State of Virginia with its registered office and registered agent located in Richmond, Virginia, which is within the Eastern District of Virginia (Stipulation of Facts, Par. 1).

2. The business records of plaintiff are kept on the accrual method of accounting and on the basis of the calendar year. The income tax returns of plaintiff for the years 1950, 1951 and 1952 were audited by the Internal Revenue Service, and various adjustments were made for each of those years. Such adjustments resulted in a determination by the Commissioner of Internal Revenue of an overassessment for 1950 and deficiencies for 1951 and 1952. The overassessment was credited to plaintiff and the deficiencies have been paid by plaintiff (Stip. of Facts, Par. 2, 3 and 4).

3. As a result of the audits of plaintiff's income tax returns for the years 1951 and 1952, the Commissioner disallowed a part of the deductions claimed for percentage depletion in the respective amounts of $3,564.36 and $2,281.96. The only dispute remaining between plaintiff and defendant relates to the amount of

percentage depletion to which plaintiff is entitled for the years 1951 and 1952. Plaintiff raised that issue by filing claims for refund for the years 1950, 1951 and 1952 within the time permitted by law and this suit was begun within two years of the disallowance of two of those claims and after the expiration of more than six months after the filing of the third claim without action thereon by the Commissioner. The year 1950 is involved because plaintiff had an unused excess profits credit for 1951 and any additional deduction for 1951 will result in a corresponding increase in the carry-back of such unused credit to offset income subjected to excess profits tax in 1950. If the action of the Commissioner in disallowing the deductions to the extent stated above is correct, plaintiff is not entitled to any tax refund for any of the years in issue. If, on the other hand, plaintiff is entitled to the full amounts of the deductions disallowed, plaintiff is entitled to refunds for the years 1950, 1951, and 1952 in the respective amounts of $539.05, $1,927.34 and $1,186.63 (Stip. of Facts, Par. 5).

4. Plaintiff owns and operates a slate quarry at Arvonia, Buckingham County, Virginia. Buckingham slate is different from other major slate deposits in the United States, particularly the Pennsylvania deposits, in two respects. It is harder and the seam has been twisted by internal forces in the earth so that the seam now lies approximately 8° off the verticle. Thus, it is not economically feasible to mine Buckingham slate by sawing large slabs from the natural deposit. In contrast, the Pennsylvania slate deposits, which are softer and lie horizontal to the surface of the earth, are mined by the use of saws.

5. The processes followed by plaintiff in exploiting its slate deposits, which processes are the same as those followed by all other slate quarries in the Buckingham seam, are as follows:

(a) The topping or overburden first is removed, and the slate is quarried by the bench method from open pit mines. The slate is removed from the seam by primary and secondary blasting with blank powder or dynamite. After the blasting some of the pieces of slate must be reduced in size to permit removal. That is done by hand splitting and plugging.

(b) The pieces of slate thought suitable for roofing slate are hauled from the quarry by aerial cableways and unloaded at a blockyard at the rim of the quarry. The refuse and unsuitable pieces also are removed from the quarry by aerial cableways and dumped in a refuse or waste dump. Blockmakers and helpers then work the materials on the blockyard to slabs or blocks where selection again is made for pieces thought suitable for roofing slate. Unsuitable pieces and smaller waste is removed to the refuse dump.

(c) The selected blocks or slabs then are transported to a conveyor which feeds the material to saws, where the blocks are sawed into lengths suitable for roofing slate. The material then is transported to workmen known as splitters. These workmen attempt to split the sawed blocks into proper thickness for roofing slate. Blocks which break up or for various reasons are found unsuitable for roofing slate or flagging are thrown into waste chutes and discarded. Any pieces unsuitable for roofing slate that are thought suitable for flagging are sent to another station where they are worked into flagging or discarded on the refuse dump. The chips or pieces which have been split to roofing slate thickness by the splitters are trimmed to proper rectangular size for a roofing slate shingle. During this process a portion of the material is discarded on the refuse dump because of unforeseen defects or breakage.

(d) The trimmed shingles then go to a punching station where they are graded for thickness and nail holes are punched in each piece for application to the roof. During this operation broken and inferior shingles are thrown out and the product remaining is stored for shipment to the trade.

6. There is no market for the unprocessed slate at the stage when it is blasted from the seam. Plaintiff has several million tons of slate in various refuse dumps

and will sell it to anyone who will haul it away for 10¢ per ton. On occasion, when a refuse dump is located in such a way as to interfere with future quarrying operations, so that plaintiff has to move the dump to another location, plaintiff has hauled the refuse to nearby aggregate plants and sold the waste material for about 40¢ per ton, which is less than the actual cost of hauling.

7. Plaintiff's sales and approximate tonnages of production for the years 1951 and 1952, broken down between roofing slate, flagstones and rubble, were as follows:

|  | 1951 Sales | | 1951 Tonnage | | 1952 Sales | | 1952 Tonnage | |
|---|---|---|---|---|---|---|---|---|
| Roofing slate | $284 878 | 74 | 5 496 | | $188 137 | 04 | 4 570 | |
| Flagstone | 14 647 | 71 | 1 192 | | 13 806 | 67 | 1 211 | |
| Rubble | 6 690 | 60 | 17 682 | | 17 264 | 10 | 50 295 | |
| | $306 217 | 05 | 24 370 | | $219 207 | 81 | 56 076 | |

In the above table the sale figures represent actual sales of the indicated products. The tonnage figures for roofing slate and flagstone represent tonnages produced and not tonnages actually sold during the years in question. Plaintiff and defendant agree, however, that variations between tonnages produced and sold are immaterial for purposes of this case. The tonnage figures for rubble represent the tonnages actually sold, not the total tonnage produced, which would be larger. The figures were stipulated in the above form because they were the only figures readily available from plaintiff's records for this purpose. (Stip. of Facts, Par. 6).

8. Although there is considerably more breakage in the production of roofing slate shingles than in the production of flagging, if plaintiff's only objective had been to produce flagging the tonnage of flagging produced would not have exceeded the combined actual tonnage production of roofing slate and flagging. The reason for this is that at least half of the slabs of slate actually used for the production of roofing slate were too small to use for the production of flagging.

9. In the years 1951 and 1952 plaintiff sold flagstones for an average price of $12.279 and $11.401 per ton, respectively. If all the production of plaintiff for those years had gone into flagstones, the quarrying cost alone, without giving any effect to splitting and trimming, overhead and selling expenses, would have been $24.597 and $28.224 per ton, respectively (Plaintiff's Exhibit 15).

10. The main objective of plaintiff's quarrying process was the production of roofing slate shingles. Flagstones are a by-product of plaintiff's operation, and the slate quarry would not have been operated at all, and could not have been operated except at a substantial loss, except for the production of roofing slate shingles.

11. Evidence was introduced that in 1952 throughout the United States there were produced approximately 54,050 short tons of roofing slate of a value of approximately $56.75 per ton, 75,480 tons of flagstone of a value of approximately $19.47 per ton and 593,390 tons of granules and flour of a value of approximately $10.31 per ton (Defendant's Exhibit 1). Slate as a generic term covers stone of so many different mineral qualities and the conditions of quarrying vary so widely throughout the country that these facts have no significant relevance to the determination to be made in this case.

12. The commercially marketable mineral product from plaintiff's slate de-

posits is the completely processed roofing slate shingles.

13. All the processes applied by plaintiff to its slate to produce completely processed roofing slate shingles are the usual and ordinary treatment processes normally applied by mine owners and operators in order to obtain the commercially marketable product from slate in the Buckingham seam.

14. Plaintiff's "gross income from the property," calculated under Section 114 (b)(4)(B) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 114(b)(4)(B), as in effect for the years 1951 and 1952 is $306,217.05 and $219,207.81, respectively, representing the selling price of roofing slate shingles, flagstones and rubble. Under Section 114(b)(4)(A) its depletion deduction computed as 5% of such "gross income from the property" is equal to $15,310.85 for 1951 and $10,960.-39 for 1952, which is less than 50% of plaintiff's net income (computed without allowance for depletion) for both years (Plaintiff's Exhibits 13 and 14).

Conclusions of Law

From the foregoing facts the Court concludes:

1. This Court has jurisdiction over the parties and the subject matter in this cause of action.

2. Plaintiff is entitled to a 5% depletion deduction for 1951 and 1952 based on its gross sales of roofing shingles, flagstones and rubble.

3. In determining the gross income from the sale of its products, plaintiff is entitled to include the gross sales of roofing shingles, flagstones and rubble mined by it and to deduct 5% thereof for depletion.

4. Plaintiff has overpaid its income tax for the years 1950, 1951 and 1952 and is entitled to recover in this action.

Decree

Upon the foregoing findings of fact and conclusions of law it is:

Ordered, Adjudged and Decreed:

That plaintiff recover judgment against defendant: for 1950 the amount of $539.05 with interest at the rate of 6% per annum from October 18, 1954, to a date not more than thirty days before the date of the refund check; for 1951 the amount of $1,927.34 with interest at the rate of 6% per annum on $594.77 from September 29, 1954, on $368.62 from October 18, 1954, and on $963.95 from December 15, 1952, in each case to a date not more than thirty days before the date of the refund check; and for 1952 the amount of $1,186.63 with interest at the rate of 6% per annum from October 18, 1954, to a date not more than thirty days before the date of the refund check.