ALBIN C. HALQUIST AND MADELINE E. HALQUIST, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 65794, 71133. Filed November 25, 1959.

*John S. Best, Esq., Kenneth K. Luce, Esq., Richard D. Hobbet, Esq.,* and *Frank J. Pelisek, Esq.,* for the petitioners.

*John R. Moodie, Esq.,* and *David H. Nelson, Esq.,* for the respondent.

DRENNEN, *Judge:* Respondent has determined deficiencies in petitioners' income tax in Docket No. 65794 for the years 1951, 1952, and 1953 in the amounts of $29,545.10, $32,134.08, and $17,974.86, respectively, and in Docket No. 71133 for the year 1954 in the amount of $24,957.92. By amended petition in Docket No. 65794, petitioners claimed overpayments of tax in 1951, 1952, and 1953 of $1,356.40, $56.94, and $4,609.30, respectively.

The issues for decision are: (1) In regard to the building and dimension stone produced and sold by petitioners, whether the gross income from the property for purposes of computing the percentage depletion allowance should be determined by reference to the sales price of the fully processed stone or by reference to the actual or representative market price of the stone in a less processed form; and (2) for years 1951, 1952, and 1953, whether petitioners are entitled under section 114(b)(4), I.R.C. 1939, to the 10 per cent depletion rate provided for dolomite or the 15 per cent rate provided for chemical or metallurgical grade limestone.

FINDINGS OF FACT.

Some of the facts have been stipulated and are incorporated herein by this reference.

Albin C. Halquist and Madeline E. Halquist, his wife, residing in the Town of Lisbon, Waukesha County, Wisconsin, throughout the years material hereto, were engaged in business as a partnership under the name of Halquist Lannon Stone Co. They filed joint and partnership income tax returns for each of said years on a calendar year accrual method of accounting with the district director of

internal revenue at Milwaukee, Wisconsin. In addition, for each of the taxable years 1952 and 1954 they filed amended joint income tax returns, and for 1954, an amended partnership return.

Throughout the taxable years the partnership owned and operated two stone quarries in Waukesha County, Wisconsin. One of them, their principal quarry, was located approximately 2 miles south of the Village of Sussex in the Town of Lisbon, and their smaller quarry, in the Village of Sussex. (Reference will hereafter be made only to the principal quarry, our holdings concerning which will also include the smaller quarry and its production.)

The partnership engaged in the business of removing the stone, processing it, and selling it in the form of two principal products. These products were crushed and broken stone of various grades and sizes, and building or dimension stone in various shapes and sizes. In addition, the partnership produced and sold flagstone and dry-wall stone. The crushed and broken stone was sold for a variety of purposes, including riprap, ballast, road surfacing, and agricultural lime. The dimension stone, sometimes referred to herein as building stone, consisted of blocks and slabs of natural stone cut in definite shapes and sizes to be used primarily for building purposes. The principal dimension stone product produced by petitioners was house-veneer stone. In the building stone category, however, they also occasionally produced "specials," sills, finished architectural stone, and other stone fabricated for special purposes according to specifications. Flagstone, generally used for landscaping purposes, is irregularly shaped stone approximately 2 inches thick and having at least one flat side. Drywall stone, usually 8 to 10 inches in width and from 2 to 4 inches in height, is generally used for laying up retaining walls without mortar joints.

The partnership also engaged in the purchase and resale of dimension stone produced by quarries in other parts of the United States.

Stone in petitioners' quarries is known as "Lannon stone" taking its name from the Lannon district which consists of an area approximately 12 miles square, and lies within the portion of the Niagara dolomite formation adjacent to Lake Michigan in Wisconsin. Although the physical and chemical characteristics of all of the stone within the formation are about the same, the formation of the stone in petitioners' quarry is found in two distinct phases. The uppermost strata consists of very thinly bedded slabs of dolomite which are broken by irregular vertical seams or joints so that pieces of stone occur naturally in blocks of a few square feet to perhaps 25 or 50 square feet in areal extent and 2 to 6 inches in thickness as a general rule. Since it can be taken out in blocks, the stone from this portion of the quarry, extending down about

15 feet in depth, referred to herein as the upper face, is particularly adaptable for the production of dimension stone suitable for building purposes. Also found in this higher strata, at its very upper level, is a thinner layer of stone which is suitable for producing flagstone and drywall.

The lower face is exposed down to about 40 feet in the mine quarry and is characterized by horizontal bedding planes and vertical joints of a markedly different nature. It is more irregularly bedded and much more irregularly broken up by seams, and as a result, is suitable only for processing into crushed and broken stone and agricultural lime.

The horizontal layers of stone in the upper strata from which building stone was produced were extracted and processed in the following manner:

(1) Small holes were drilled vertically into the stone behind the upper face of the quarry, and a small quantity of black powder was inserted in these holes and detonated. The blast did not break up the rock, but the resulting gases followed the natural bed layers and seam faces and loosened the stone from the natural bed deposit. The slabs of stone, ranging from 2 to 3 square feet to extremes of 100 square feet in the horizontal plane (the smaller size pieces were more predominant in petitioners' quarry), were loosened one from the other with crowbars and wedges.

(2) At the upper face blockmen broke the larger pieces of stone into irregularly shaped pieces using one of two methods—either by a blow from a hammer after first scoring along the line on which it was to be broken, or by plugging and feathering, which also involved scoring, then the drilling of holes on the scored line and, finally, the driving of wedges into the holes until the stone split.

(3) Using large steel pans the blockmen then sorted the pieces into three categories. Into one pan they placed waste; into the second pan, flagstone and drywall requiring no further processing; and into the third pan they placed the pieces of stone suitable for processing into dimension and building stone. At this point, at the upper face of the quarry, there was approximately one pan of waste for each pan of flagstone, drywall, and stone to be further processed into dimension stone, resulting then in a waste factor of 40 to 50 per cent. The waste pans were hauled to the edge formed by the bed of the upper face and the top of the lower face, and the waste was dropped to the bed of the lower face to be picked up by mechanical shovels and fed to the crusher. Neither flagstone nor drywall was cut or dressed by cutters, but was broken into desired sizes by blockmen at the face and then merely set aside. The pans containing the stone suitable for processing into dimension stone were carried by trucks operated by blockmen to the cutters, who were

arranged around the edge of the quarry mentioned above at a distance of from 50 to 250 feet from the place where the stone was quarried. After large diamond saws were purchased in the latter part of 1954 and were used to perform a smaller part of the cutting operation, stone was also carried by the blockmen to the sawyers.

(4) The cutters then cut and broke the stone into smaller pieces having regular shapes and suitable for use as dimension or building stone. The principal product produced by the cutters of petitioners' company was house-veneer stone, which was of random lengths and heights depending upon the size and shape of the stone taken out of the quarry. Its width, however, was uniformly a maximum of 4 inches.

(5) Production of the dimension stone by the cutters, which involved cutting, dressing, and drilling of the stone to desired dimensions, was accomplished primarily by the use of hand tools, which included hammers, tiflers, a variety of chisels, bullwedges, shims, and electric handsaws. To separate or break the stone the cutters utilized several methods. One involved the scoring of the stone with an electric handsaw or a type of chisel called the tracer and then the striking of the chisel with a hammer. A more common method was to score the stone and then continue to trace all along the line until the stone split—tracing consists of striking a stone with a hammer and chisel. The third method, known as bullwedging, used to break the thicker pieces of stone, involved scoring, and the chiseling of a small hole into which were placed shims and a wedge; striking of the wedge with a hammer caused the stone to split.

With the large saws, installed by petitioners in 1954, it was possible to saw much larger pieces of stone than had theretofore been handled by individual cutters. Whenever a slab was obtained from the face of the quarry which was large enough to allow economic use of the diamond saw the slab was not broken at the face of the quarry but was brought to the saw and sawed to dimensions suitable for building stone.

Of the stone brought from the quarry to the cutters for further processing, another 40 to 50 per cent by weight was lost in processing to finished dimension stone; here again this waste was directed to the crushing processes.

The stone deposit below the building stone level of the quarry, which was wholly unfit for use in producing building stone, and the waste from the building stone processes were utilized by petitioners to produce crushed or broken stone and agricultural lime. Stone was secured from the quarry and processed into crushed stone in the following manner:

(1) Charges of dynamite were lodged into deep vertically drilled holes and detonated. Large quantities of stone were, as a result, hurled to the quarry's floor. Most of the stone freed from the quarry face was in pieces small enough to be directed to the crusher; the large pieces were broken by a steel ball. The stone thus blasted and broken from the face of the quarry was then lifted by mechanical shovels and hauled to the crusher which was located at the quarry.

(2) The primary crusher crushed the stone into sizes ranging from dust to over 3 inches in diameter. By conveyor belt the stone was automatically run through a screening process which segregated it into 7 sizes. Stone over 3 inches in diameter was automatically returned to the primary crusher for additional crushing. Some of the stone, 1 to 3 inches in diameter, was run through a hammermill for a secondary crushing operation if smaller sizes were needed, and this stone was also automatically screened and graded.

(3) In the latter part of 1952, petitioners purchased a new crushing plant. From that time on through the remainder of the years involved, the new larger primary crusher was utilized. Also, in addition to the primary crusher and a hammermill, the new plant had a gyratory crusher which was utilized instead of the hammermill for secondary crushing of some of the stone.

The other type of stone handled by petitioners was building stone that was purchased from various parts of the country, almost all of which was different in nature and character from the type of stone found in the Lannon area. Most of this stone was purchased in finished form and was handled by petitioners in order to complete their stone line and to meet consumer requests. Only a small portion was purchased in rough block form and cut by petitioners. Included in the stone purchased was a negligible number of rough blocks of Lannon stone from the very few quarries in the area whose deposits enabled them to take out solid pieces large enough to be processed by saw. This purchased stone facet of petitioners' business is not in issue here.

During the years 1951 through 1954, the selling price of drywall in this area was about $6 per ton; of flagstone, about $10 per ton; and of house-veneer stone, about $26 per ton. Sills and other specially finished architectural stone averaged about $50 to $70 per ton. Crushed stone was marketed by petitioners at prices ranging from approximately $1.03 to $1.23 per ton.

For each of the taxable years, total sales in tons and dollars (after reduction for delivery and trade discounts, i.e., "gross income from the property"), direct costs, and net income (after allocating the

selling and administrative expenses) attributable to crushed stone and building stone were as follows (cents omitted):

|  | 1951 | | 1952 | | 1953 | | 1954 | |
|---|---|---|---|---|---|---|---|---|
|  | Building stone | Crushed stone | Building stone | Crushed stone | Building stone | Crushed stone | Building stone | Crushed stone |
| Tonnage | 18,514 | 69,097 | 18,891 | 83,387 | 17,246 | 176,689 | 12,311 | 155,537 |
| Sales | $426,780 | $84,781 | $389,822 | $102,278 | $355,699 | $182,229 | $204,399 | $179,616 |
| Direct costs | $287,322 | $64,533 | $260,058 | $108,481 | $257,603 | $124,731 | $217,760 | $151,851 |
| Net income | $105,687 | $8,299 | $107,576 | ($9,840) | $72,787 | $44,508 | $55,079 | $15,900 |

In computing the depletion deduction, petitioners used as the gross income from the property the gross proceeds less delivery costs and discounts from the sale of crushed and broken stone, flagstone and drywall, and fully processed dimension stone, and for the years 1951 through 1954, claimed $54,840.27, $46,294.99, $34,074.73, and $45,-242.77, respectively. On the theory that gross income from the property in respect to the finished dimension stone must be limited to the value of rough uncut stone prior to cutting and finishing, respondent in his deficiency notice disallowed petitioners' depletion deductions to the extent of $42,357.73, $45,346.63, $14,854.55, and $41,094, respectively. By amended answer respondent subordinated to an alternative status the basis of his deficiency notice and placed primary reliance on his so-called "least-processing" theory with any increased deficiencies that may result to be redetermined by the Court.

Although numerous dolomite or limestone deposits occur throughout the country, only a relatively few consist of rock that would satisfy the exacting requirements of dimension stone. Deposits with irregularly or closely spaced joints are unsuitable, as large blocks free from cracks or lines of weakness are demanded. Furthermore, only those deposits that are compact, easily workable, uniformly textured, and attractively colored merit consideration for such use. Among the dolomite or limestone deposits suitable for the extraction of stone usable for building purposes, there is a great deal of variation in the spacing and arrangement of the bedding planes, seams, and joints, and this in turn determines the size and shape of the blocks of stone which can be removed from a particular deposit. The nature of the stone deposit will also determine the processes which can be employed in its extraction and fabrication into building stone.

Bedford-Bloomington (Indiana) limestone, which is also used for building stone, occurs in large monolithic deposits running to depths of approximately 70 to 80 feet. The widely spaced joints in the stone permit its extraction in large, regularly shaped blocks. As a result the quarries in Indiana utilize channeling machines or wire-

saws and produce rectangularly shaped blocks of uniform dimensions having relatively smooth faces. These rough blocks, relatively large and regularly shaped, rather than being processed and finished into dimension stone at the quarry are sold to cut-stone processors in the Chicago and Milwaukee market area.

The characteristics of the Niagara dolomite escarpment, as extensive as it is in Wisconsin, apparently make possible the extraction of only a limited amount of stone suitable for processing into dimension or building stone. Building stone quarrying in the escarpment is largely confined to the Lannon district and a small area south of Fond du Lac, Wisconsin. And there the relatively thin horizontal bedding planes and irregular vertical seams or joints result in the production of blocks considerably smaller, more irregular, and rougher than blocks quarried in Indiana. The horizontal beds of the upper strata (the source of the building stone) of petitioners' quarry generally occurred in thicknesses of only 2 to 6 inches—only once did petitioners uncover a layer which reached 30 inches in depth. The small and irregular blocks of Lannon stone were not suitable for processing into building stone by mechanical means and were necessarily processed from the initial stages through the finished stone largely by hand.

Cut-stone processors, who cut building stone which is competitive with petitioners' finished building stone, find it uneconomical and unfeasible to purchase for processing the rough slabs or blocks of Lannon stone quarried by petitioners. From Indiana and other areas of the country the commercial processors can procure a steady and dependable supply of very large blocks of uniform shape and dimension that can be economically processed by large-scale machine operations. The character of Lannon stone generally precludes the production of blocks of this type or volume. Whereas the processing of uniformly shaped blocks of Indiana limestone involves only about 5 per cent waste, processors would be required to transport from the Lannon district quarries up to 50 per cent waste, and then be faced with a difficult disposal problem at their processing plants. Moreover, Lannon stone is more difficult to fabricate after its natural moisture has dried out, and, therefore, has to be cut very shortly after it has been quarried; also, this stone is not readily workable on the large bedded planers, one of the more important of the processors' machines. On both counts the converse is true in the case of Indiana limestone.

As a result, there was no market among processors, or anyone else, for petitioners' rough uncut blocks of stone. It was necessary for almost all of the quarries in the Lannon area to process their own stone into finished building stone at the quarry and to sell directly to the ultimate user in order to compete with Indiana limestone.

Petitioners were one of approximately 40 operators producing building or dimension stone in the Lannon and Fond du Lac areas. Many of the quarries were operated by 1 or 2 men and the average quarry employed about 5 men. Petitioners with approximately 70 or 80 men produced 50 per cent of the building stone quarried in the Lannon district. The processes they utilized from the initial stages of quarrying through the cutting and shaping of the finished stone were similar to those used by the other building stone operators in the Niagara dolomite formation.

The first commercially marketable mineral products produced by petitioners during the years 1951 through 1954 were crushed and broken stone, flagstone and drywall, and finished dimension stone after completion of the necessary cutting, breaking, and trimming processes, all of which were ordinary treatment processes normally applied by mine owners to obtain the commercially marketable mineral product from their raw mineral deposit.

A chemical analysis of the stone in petitioners' quarry revealed a composition averaging in content 51.72 per cent calcium carbonate, 45 per cent magnesium carbonate, and 3.28 per cent total impurities, including a silica content of 2.85 per cent. This stone found in petitioners' quarry was dolomite.

OPINION.

There is no dispute that under section 114(b)(4), I.R.C. 1939,[1] and section 613(a), I.R.C. 1954,[2] petitioners are entitled to a per-

---

[1] SEC. 114. BASIS FOR DEPRECIATION AND DEPLETION.
  (b) BASIS FOR DEPLETION.—

  *    *    *    *    *    *    *

    (4) PERCENTAGE DEPLETION FOR COAL AND METAL MINES AND FOR CERTAIN OTHER MINES AND NATURAL MINERAL DEPOSITS.—

      (A) In General.—The allowance for depletion under section 23(m) in the case of the following mines and other natural deposits shall be—

  *    *    *    *    *    *    *

        (ii) in the case of * * * dolomite * * * 10 per centum,
        (iii) in the case of * * * metallurgical grade limestone, chemical grade limestone * * * 15 per centum, * * *

  *    *    *    *    *    *    *

    of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property, except that in no case shall the depletion allowance under section 23(m) be less than it would be if computed without reference to this paragraph.

      (B) Definition of Gross Income From Property.—As used in this paragraph the term "gross income from the property" means the gross income from mining. The term "mining", as used herein, shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products * * *

[2] SEC. 613. PERCENTAGE DEPLETION.
  (a) GENERAL RULE.—In the case of the mines, wells, and other natural deposits listed in subsection (b), the allowance for depletion under section 611 shall be the percentage,

centage depletion allowance on the stone that they quarried. This allowance is based on a specified percentage, depending upon the specific mineral mined, of the gross income derived from the property to the extent that it does not exceed 50 per cent of the net income ("taxable income" in I.R.C. 1954) from the property. "Gross income from the property" is defined in section 114(b)(4)(B), I.R.C. 1939, and section 613(c), I.R.C. 1954, as the gross income from mining, and "mining" is to include, in addition to the extraction of the ore or mineral from the ground, the "ordinary treatment processes normally applied by mine owners and operators in order to obtain the commercially marketable mineral product or products."

With the objective of providing a simplified method of computing depletion allowances which would avoid the complications and difficulties arising in connection with cost and discovery depletion, Congress in 1926 introduced percentage depletion based on "gross income from the property." [3] The ambiguity inherent in the phrase "gross income from the property" and the disputes arising therefrom led to the enactment [4] in 1943 of the definition found in subsection (B) of section 114(b)(4), which has been carried substantially intact through the 1954 Code. Although it then became clear that the gross income upon which the depletion allowance was to be based was to include income derived from processes that went beyond mere extraction of the mineral from the ground, the basis for disputes had not been eliminated—it shifted in focus to the interpretation

specified in subsection (b), of the gross income from the property excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 percent of the taxpayer's taxable income from the property (computed without allowance for depletion). In no case shall the allowance for depletion under section 611 be less than it would be if computed without reference to this section.

(b) PERCENTAGE DEPLETION RATES.—The mines, wells, and other natural deposits, and the percentages, referred to in subsection (a) are as follows:

\* \* \* \* \* \* \*

(6) 15 percent—all other minerals (including, but not limited to \* \* \* dolomite, \* \* \* limestone, \* \* \* stone (used or sold for use by the mine owner or operator as dimension stone or ornamental stone), \* \* \* except that \* \* \* the percentage shall be 5 percent for any such other mineral when used, or sold for use, by the mine owner or operator as rip rap, ballast, road material, rubble, concrete aggregates, or for similar purposes. \* \* \*

\* \* \* \* \* \* \*

(c) DEFINITION OF GROSS INCOME FROM PROPERTY.—For purposes of this section—

(1) GROSS INCOME FROM THE PROPERTY.—The term "gross income from the property" means, in the case of a property other than an oil or gas well, the gross income from mining.

(2) MINING.—The term "mining" includes not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products \* \* \*

[3] Sec. 204(c)(2), Rev. Act 1926, 44 Stat. 16; Report of Committee on Finance, S. Rept. No. 52, 69th Cong., 1st Sess., p. 17.

[4] Sec. 124(c), Rev. Act 1943, 58 Stat. 45; Report of Committee on Finance, S. Rept. No. 627, 78th Cong., 1st Sess., p. 23.

of the new phrase "ordinary treatment processes normally applied by mine owners and operators in order to obtain the commercially marketable mineral product or products."

It was soon settled that "commercially marketable mineral product" meant the *first* commercially marketable mineral product resulting from the application of ordinary treatment processes. *International Talc Co.*, 15 T.C. 981; *Black Mountain Corporation*, 21 T.C. 746; *Riverton Lime & Stone Co.*, 28 T.C. 446.

In an effort to limit the scope of "mining" as defined in subsection (B), however, the Commissioner persistently attempted to distinguish and draw a line between extraction processes and manufacturing processes, arguing that the latter were not allowable "ordinary treatment processes." The courts rejected this effort. In *United States* v. *Cherokee Brick & Tile Company*, 218 F. 2d 424 (C.A. 5); *United States* v. *Merry Brothers Brick and Tile Co.*, 242 F. 2d 708 (C.A. 5), certiorari denied 355 U.S. 824; and *United States* v. *Sapulpa Brick and Tile Corporation*, 239 F. 2d 694 (C.A. 10), contrary to the Commissioner's contention that the processes by which raw clay was transformed into burnt brick and tile were unallowable manufacturing processes, it was held that fully processed brick and tile were the first commercially marketable products from the mineral involved, and that all of the processes utilized to obtain this product were ordinary treatment processes. *Dragon Cement Company* v. *United States*, 244 F. 2d 513 (C.A. 1), certiorari denied 355 U.S. 833, held that manufactured cement, involving a chemical change in the processing of the raw mineral, was the first commercially marketable product from cement rock. *Riverton Lime & Stone Co.*, *supra*, held that hydrated hydraulic lime was the first such product from a limestone mine. In *Townsend* v. *Hitchcock Corporation*, 232 F. 2d 444 (C.A. 4), pulverized talc and talc crayon were found to be the commercially marketable products obtained from ordinary treatment processes, regardless of whether they may be considered to be "manufactured" products. These and other courts were of the uniform opinion that the statutory language was clear and unambiguous, and that gross income from mining included the income from all processes ordinarily and normally applied to obtain the first product marketable in commerce. The depletion allowance not being an allowance upon any processes as such, did not necessitate distinguishing between mining processes and manufacturing processes.[5]

---

[5] Following denial by the Supreme Court of certiorari in *United States* v. *Merry Brothers Brick and Tile Co.*, 242 F. 2d 708 (C.A. 5), certiorari denied 355 U.S. 824; and *Dragon Cement Company* v. *United States*, 244 F. 2d 513 (C.A. 1), certiorari denied 355 U.S. 833, Internal Revenue Service announced that the decisions in the "brick and tile" cases would be accepted and followed. T.I.R. 62, Oct. 18, 1957.

Shifting his emphasis now to a new theory which would restrict the scope of the depletion allowance, respondent here argues that the first commercially marketable mineral product in any particular mining industry is the crudest, least processed product for which a commercial market exists in the United States in more than negligible quantities, and that the processes utilized and normally applied by mine owners and operators in that industry to produce this crudest marketable product are the only processes which can be considered to be ordinary treatment processes within the meaning of the statute. To ascertain the crudest, least processed, yet marketable, product for the particular mineral industry involved, respondent would look to the country as a whole. Once the product base had been determined for an entire industry it would serve as the standard for all of the producers of that mineral, notwithstanding that an individual miner or operator may not produce or market it or be capable of marketing it at a profit. Those who processed and marketed a product other than the standard industry product would be required to utilize as their depletion base a gross income reconstructed by reference to the representative market price of the crudest, least processed marketable product from a mineral of like kind and grade, or if there is no such market price, respondent would allocate and eliminate on the basis of costs all income attributable to processes beyond those necessary to produce the crudest product.

For the dolomite and limestone industry, then, respondent shows that the crudest, least processed product marketed in more than negligible quantities is crushed and broken stone. The processes normally applied by limestone and dolomite operators to obtain crushed and broken stone, respondent contends, are the only "ordinary treatment processes" contemplated by the statute. This would be so in spite of the variety of products which may be and are in fact produced from a limestone or dolomite mine. Thus in petitioners' case the gross income from the sales of their crushed stone would all be includible in the depletion base. On the other hand, respondent insists, income from the sale of building or dimension stone, a more highly refined product utilizing processes quite different from those required to produce crushed stone, would be excluded to the extent of the income attributable to the additional processing steps—that is, income from the sale of building stone must be limited to the income that would have been derived if such stone had been sold as crushed and broken stone.

The so-called "least-processing" theory appears to have first been advanced by respondent before the Seventh and Eighth Circuits in his appeals from the District Court's decision in *Cannelton Sewer*

*Pipe Co.* v. *United States*, 268 F. 2d 334 (C.A. 7), and from this Court's decision in *Commissioner* v. *Iowa Limestone Co.*, 269 F. 2d 398 (C.A. 8), affirming 28 T.C. 881, both of which were still pending when the case here before this Court was submitted. Since then both appellate tribunals have handed down their decisions and both totally rejected respondent's interpretation.

In *Cannelton*, the taxpayer mined fire clay and shale and manufactured therefrom vitrified clay sewer pipe and related products. The income derived from the sale of his fully processed products was used as his basis for depletion. The Government urged that since there was an existing substantial market for raw clay and shale in the immediate area, as well as in the State of taxpayer's mine, the raw unprocessed mineral was his first commercially marketable product. The court pointed out that taxpayer's mining costs alone, due to a more expensive underground type of operation, exceeded the current selling price of raw clay and shale, and in view of this fact was unable to understand how raw clay and shale could be considered commercially marketable products for this particular taxpayer. In the Court's view, taxpayer had to be in a position to sell his product at a profit before it was "commercially marketable," and in order to achieve this end, taxpayer found it necessary to further process his raw material into vitrified clay sewer pipe. The evidence also showed that integrated mining and manufacturing operations wherein the raw material was processed by the mining operators into a finished product was the rule rather than the exception in taxpayer's area in the year involved, and that the treatment processes used to obtain his finished products were ordinary and normal. In rejecting respondent's contention that there can be only one depletable or commercially marketable product for each mineral, the court said:

The short answer to this is that we do not agree that it was intended that the depletion allowance for each mineral be reduced to the common denominator represented by a conceivable product most cheaply produced from each mineral.

Again respondent urged in *Iowa Limestone* that the crudest, least processed product marketable from taxpayer's limestone quarry was crushed limestone, even though taxpayer marketed only finely ground or pulverized chemical grade limestone. Although there clearly was a market for crushed limestone for road and agricultural purposes and taxpayer's stone could have all been crushed and utilized for such purposes (as a minor amount of dirty and contaminated material was), his deposit of limestone was a relatively rare and special type particularly suitable for chemical use. In its pulverized form processed for chemical use, the limestone was considerably more

valuable and commanded a higher price than crushed stone. The court was of the opinion that the taxpayer—

had the right to market its chemical grade limestone for the purpose for which it was most suited and in a field where it would command a fair price. Gold, silver, and iron ores and other valuable minerals could doubtless be sold for road rock, fill, or ballast, but no one would contend that their value must be determined upon such a limited use of such products. It was not economically feasible for the taxpayer to market its superior stone as ordinary road rock. Many kinds of cheap stone would equally serve such a purpose.

While there are some differences in the facts in those two cases and in this case, the courts in those cases specifically rejected substantially every argument advanced by respondent in this case in support of his most recent theory, and we think the principles announced in those decisions are equally applicable here.

In both of those cases the courts rejected the argument that the one most cheaply produced product of the mineral that could be produced and sold at a profit by someone somewhere in the country was the commercially marketable product for all taxpayers in that industry, regardless of whether it was economically feasible for the particular taxpayer to produce and market that product at a profit. Both courts stated that the profit-making aspect must be given consideration in determining whether a mineral product is commercially marketable, and that the taxpayer has a right under the statute to market its mineral for the purpose for which it is most suited. We agree. *Riverton Lime & Stone Co., supra; Iowa Limestone Co.*, 28 T.C. 881.

In *Iowa Limestone*, the Court of Appeals also rejected respondent's argument that for depletion purposes all types of limestone must be considered the same mineral. We agree that the depletion base of a taxpayer is not limited to the gross income that would be produced by the sale of the most inferior grade of the mineral produced by him, but is the gross income that would be produced by the sale of the first commercially marketable products of the mineral produced for the purposes for which it, in its natural state, is best suited. Here the finished building stone was not merely the product of extended crushed stone processing, but originated in the raw material itself, so formed as to be peculiarly adaptable to building purposes, and the processing took an entirely different course from the beginning. This case is, therefore, distinguishable from *Black Mountain Corporation, supra*, where the Court disallowed income attributable to oil treatment of coal, and *Sparta Ceramic Company v. United States*, 168 F. Supp. 401 (N.D. Ohio), wherein the court disallowed the glazing of tile, because in those cases the processes disallowed were additional processing of already marketable products to produce a more expensive product.

We find no inequity in allowing a taxpayer who has a high-grade mineral a greater depletion base than one who has a lower grade of the same mineral. Depletion is designed to permit a taxpayer to recover the value of his wasting asset mined and removed. *Anderson* v. *Helvering*, 310 U.S. 404; *Dragon Cement Company* v. *United States, supra.* Petitioners here, with a dolomite suitable in part for building stone, have a greater value to recover than would a person who owned a quarry with dolomite suitable only for crushed stone purposes. For respondent to say that there is no more exhaustion of the mineral deposit through the extraction of a ton of stone suitable for building purposes and a ton of stone which may be used only in crushed form is to ignore the difference in economic value between each ton.

We believe Congress recognized that the value of natural resources might fluctuate widely, depending upon their accessibility or the products which they are capable of yielding, by making the gross income from the property serve as the base for computation. Respondent would deny this result by his "least-processing, single product" theory. If Congress, in its quest for simplicity, had intended the result prescribed by respondent it could have more simply specified the single product which was to form the basis for depletion for any particular mineral industry. It is no answer to say that differences in the value of natural resources are taken care of in the rate of depletion. Respondent claims that all dolomites should be allowed the same rate of depletion, so under his theory there would be no recognition at all of differences in value of various types or grades of dolomite.

One distinction in the facts in this case and the *Cannelton* and *Iowa Limestone* cases which respondent emphasizes is the fact that petitioners here actually produced crushed stone in their larger quarry and could in all likelihood have crushed the building stone and marketed it at a profit in that form, whereas in *Cannelton*, petitioner could not have marketed raw fire clay at a profit, and in *Iowa Limestone*, petitioner did not actually market its limestone as crushed stone, although it could have been so marketed. But both cases established that the depletion allowance for a mineral need not be limited by a product most cheaply produced from the mineral and that a taxpayer has the right to market his mineral for the purpose for which it is most suited. And that the depletion base for a taxpayer may consist of income from the sales of more than one product has been uniformly recognized by other courts. *United States* v. *Cherokee Brick & Tile Company, supra; United States* v. *Sapulpa Brick and Tile Corporation, supra; United States* v. *Merry Brothers Brick and Tile Co., supra; Townsend* v. *Hitchcock Corporation, supra; Richland Shale Products Company* v. *United States,*

168 F. Supp. 731 (E.D. S.C.); *Arvonia-Buckingham State Company* v. *United States*, 167 F. Supp. 903 (E.D. Va.); *Cannelton Sewer Pipe Co.* v. *United States*, *supra*. To rely on the factual distinction above mentioned would suggest the absurd result that petitioners would be entitled to less depletion on their building stone in their main quarry where the crusher was located than on their building stone in their smaller quarry where there was no crusher; and less than other smaller building stone producers in the area are entitled to on their building stone of like quality just because they had no crusher.

Respondent argues in the alternative that if crushed stone is not the first commercially marketable product for all of petitioners' stone, then rough uncut stone is the first marketable product for their building stone, and that either the selling price of their drywall stone, or a representative price of rough uncut blocks of dolomite and limestone suitable for processing into finished building stone should be used as their basis for depletion.

It is clear from the evidence that it would be economically unfeasible, and probably impossible as well without a great deal of waste, for petitioners to attempt to cut their dimension stone into either flagstone or drywall. Petitioners sell all of their stone that is suitable for this purpose as flagstone or drywall because it requires no processing. Because it requires no processing, it can be sold for less than it costs petitioners to process even their building stone. While flagstone and drywall may be the cheapest to produce and first commercially marketable product of petitioners' quarry, that does not make it the first commercially marketable product of that part of petitioners' mineral deposit suitable for building stone.

The evidence also indicates that there is virtually no market for uncut Lannon building stone, principally because only about 25 per cent of it can be made into usable building stone, and it would cost a stone processor too much to transport and store the waste. The market for rough stone was created by stone of an entirely different type, principally Indiana limestone, which is capable of being quarried in large blocks of uniform dimensions and can be processed into building stone with relatively little waste and after a considerable lapse of time. We feel that petitioners have established that the rough uncut blocks of their Lannon stone were not commercially marketable until cut or sawed into finished dimension or building stone. If we were to hold otherwise we see no reason why the price of rough uncut stone should not be applied to the entire tonnage of the uncut building stone produced by petitioners at the time it is first separated from its natural deposit and before any of it is broken into waste, and we feel this would produce an unrealistic and uncontemplated result.

Application of respondent's crudest, least-processed theory uniformly throughout the building stone industry would require use by most of the producers in the Milwaukee area of entirely hypothetical gross income and net income figures to establish their depletion allowances. The statute refers to the "gross income from the property" and the "net income of the taxpayer * * * from the property." Sec. 114(b)(4)(A), I.R.C. 1939. We do not think this calls for use of hypothetical income figures when the income of the taxpayer from his property is ascertainable from his own receipts and expenditures.

We hold for petitioners on this issue. By doing so, however, we do not intend to imply that a producer of building stone may include in gross income from the property for depletion purposes the entire sales price of his finished stone regardless of the amount of processing used to produce it. The selling price of the stone processed to the point that it is commercially marketable for the purpose for which it is best suited should be the basis for depletion. We do not have sufficient evidence before us in this record to determine whether the apparently negligible amount of ornamental stone, or "specials," sold by petitioners were the first commercially marketable products within the meaning of the statute or were refinements of a commercially marketable product, and we are not deciding that here. The parties have stipulated the figures to be used as gross income if we sustain petitioners' position that they are entitled to compute depletion on the basis of their gross income from sale of crushed stone, after all crushing operations, plus sales of building stone after all cutting processes have been performed. Inasmuch as we have found that the basis for computing percentage depletion used by respondent in his notice of deficiency, being a hypothetical selling price of rough uncut stone, is not correct, the presumptive correctness of respondent's determination has been overcome and the only evidence we have before us favors petitioners' method of computing their gross and net income for depletion purposes.

The remaining issue concerns the proper percentage depletion rate to be applied to petitioners' product for the years 1951 through 1953 under the Internal Revenue Code of 1939. As a result of revisions in the 1954 Code and a more explicit delineation of the mineral categories applicable to petitioners' products, the parties are in agreement as to the rates to be applied for the year 1954. In respect to the earlier 3 years, respondent determined that the rock quarried by petitioners was limited to the 10 per cent rate provided for dolomite. Petitioners agree that the rock was dolomite, but argue that it also qualified as "metallurgical grade limestone, chem-

ical grade limestone" [6] and is entitled to the higher 15 per cent rate provided for in the statute.

The essential constituent of limestone rock is calcium carbonate. When the rock also contains in addition magnesium carbonate to the extent of 35 or 45 per cent of its composition, it is known as dolomite. *Virginian Limestone Corporation*, 26 T.C. 553; *Blue Ridge Stone Corporation* v. *United States*, 170 F. Supp. 569 (W.D. Va.). There is little question that the rock quarried by petitioners, with a magnesium carbonate content of 45 per cent, was dolomite and is clearly entitled to at least the 10 per cent rate specifically provided for by section 114(b)(4)(A)(ii). The question of first impression before us, however, is whether dolomite can at the same time be a "metallurgical" or "chemical grade limestone" under the statute, and if so, whether Congress intended the 10 per cent or 15 per cent rate to apply to a dolomite so qualifying.

The legislative history of the Act by which this mineral was added to the depletion statute in 1951 gives only general guidance as to what was intended by Congress. The Report of the Senate Committee on Finance on the Revenue Act of 1951 (S. Rept. No. 781, 82d Cong., 1st Sess., p. 38) stated: "The names of all the various enumerated materials are of course intended to have their commonly understood commercial meaning." The conference report on this Act (H. Rept. No. 1179, 82d Cong., 1st Sess., p. 75) contained the following language:

It is intended, in any case where a mineral is specifically provided for at a stated rate of percentage allowance, that the specific provision will govern over the allowance provided (whether higher or lower) for a more general classification.

However, the legislative history gives no clue as to what was intended to be included in the terms "chemical grade" and "metallurgical grade" limestone. *Wagner Quarries Company* v. *United States*, 154 F. Supp. 655, affirmed per curiam 260 F. 2d 907 (C.A. 6).

There apparently is no generally accepted and commonly understood commercial meaning of metallurgical or chemical grade limestone. The quality or composition of limestone required by the various industries utilizing it for its metallurgical or chemical properties varies considerably with the industries or the use to which it would be put. While petitioners' expert witness in this case testified that he thought the term "limestone" is often used to include dolomite and that a dolomite having a combined magnesium and calcium carbonate content of 95 per cent could qualify as a chemical or metallurgical grade limestone, he also stated that a customer ordering chemical or metallurgical grade limestone would usually

---

[6] For convenience, hereafter referred to as "metallurgical or chemical grade limestone."

specify the minimum content of either magnesium or calcium carbonate and the maximum impurities acceptable. On the other hand, respondent's expert witness testified that a mineral or stone having the above composition would not be commonly understood to be chemical or metallurgical grade limestone.

We do not believe it is within our province to assume that Congress intended to include a high-grade dolomite within the classification chemical or metallurgical grade limestone when it specifically granted a 10 per cent rate to dolomite. This would be true even if we accept petitioners' contention that the term "limestone" is commonly understood to include dolomite and that dolomite with a combined carbonate content of 95 per cent would qualify as a chemical or metallurgical grade limestone. Absent some evidence that Congress intended the latter phraseology to encompass high-grade dolomite and thus overlap the term "dolomite" specifically used in the 10 per cent category, we will apply the concept stated in the conference report quoted above that when a 10 per cent rate was specifically provided for dolomite, that rate shall apply to all dolomite, whether it could also be classified as stone entitled to a 5 per cent rate, as argued by respondent in *Virginian Limestone Corporation, supra*, or as chemical or metallurgical grade limestone entitled to a 15 per cent rate, as argued by petitioners here.

The more recent cases which have considered this particular question are not controlling because they did not involve a mineral which qualified as a specifically mentioned mineral as well as a chemical or metallurgical grade limestone. In *Iowa Limestone Co., supra*, it was held that a limestone which is at least 95 per cent pure, free from toxic impurities and containing not more than 1 per cent moisture, is known in industry and commerce as chemical grade limestone; but there the mineral contained at least 95 per cent calcium carbonate and hence was not dolomite. In *United States* v. *Wagner Quarries Company*, 260 F. 2d 907 (C.A. 6), the Court of Appeals said that "a reasonable interpretation of congressional intent in using the words 'metallurgical grade limestone, chemical grade limestone,' would mean a limestone of high carbonate content with a very low silica or impurities percentage, capable of use for metallurgical or chemical purposes." But the mineral there involved was about 85 per cent calcium carbonate and 10 per cent magnesium carbonate, and thus was not dolomite.

On the other hand, this Court held in *Virginian Limestone Corporation, supra*, that if the mineral qualified as dolomite, it was entitled to the 10 per cent rate even though it might also be considered "stone," "calcium carbonates," or "magnesium carbonates" because the term "dolomite" is a term of specific designation, while

the others are terms of general classification. We recognize that the terms "chemical" and "metallurgical grade limestone" are not as general a classification as "stone." Nevertheless, petitioners' stone ·is dolomite and we do not think Congress intended that such a specifically designated mineral should be allowed a 15 per cent rate because it might also qualify as a chemical or metallurgical grade limestone any more than it should be limited to a 5 per cent rate because it also qualifies as stone. We stated in the *Virginian Limestone* case that the "provisions of the statute here.involved are specific and free from ambiguity. In such situation, there is no room for an interpretation, by the Commissioner or by the Courts, which would vary (either upward or downward) the stated rates for specifically identified minerals, which Congress has provided." We reaffirmed that finding and that rule of statutory construction in *Spencer Quarries, Inc.*, 27 T.C. 392, dealing with quartzite. We believe they are equally applicable here.

The 10 per cent depletion rate allowed in the case of dolomite is applicable to all of petitioners' production here involved during the years 1951, 1952, and 1953.

*Decisions will be entered under Rule 50.*