JAMES RIVER HYDRATE & SUPPLY COMPANY, Incorporated, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 1175.

United States District Court
W. D. Virginia,
at Roanoke.

Sept. 25, 1963.

Hazlegrove, Shackelford & Carr, John D. Carr, John H. Young, Roanoke, Va., for plaintiff.

Thomas B. Mason, U. S. Atty., Roanoke, Va., Louis F. Oberdorfer, Edward S. Smith, Dept. of Justice, Washington, D. C., for defendant.

MICHIE, District Judge.

This case involves the question whether the plaintiff (hereinafter usually called "James River") is entitled to a 15% rate of depletion on stone quarried and sold from its plant on the James River about one mile east of Buchanan, Virginia, or should be limited, as the United States of America (sometimes hereinafter called the "Government") contends, to a 10% rate.

Since only the taxable years 1952 and 1953 are involved in this proceeding, the issue turns on the Internal Revenue Code of 1939, as amended, and, more particularly, upon the correct interpretation of § 114(b) (4) (A) thereof. The pertinent part reads as follows:

"(i) in the case of * * * stone * * * 5 per centum,

"(ii) in the case of * * * dolomite, magnesite * * * calcium carbonates, and magnesium carbonates, 10 per centum,

"(iii) in the case of * * * metallurgical grade limestone, chemical grade limestone * * * 15 per centum, * * *."

The Government contends that the plaintiff's stone is "dolomite" and therefore entitled only to the 10% depletion rate specifically provided for dolomite and further that it is not in fact a limestone and therefore in no event would be entitled to the 15% rate. James River admits that the stone in question is dolomite but contends that it is also metallurgical and chemical grade limestone and therefore entitled to the 15% rate.

The Government's first contention is based on the argument that the term "dolomite" is a more specific term than the terms "metallurgical grade limestone" and "chemical grade limestone" and that therefore James River, which admits that its product is a "dolomite", should be limited to the rate provided for the more specific term "dolomite" even if, as James River contends, its product is also a high grade limestone used for metallurgical and chemical purposes. The Government's second argu-

ment to show that the stone is not a metallurgical or chemical grade limestone is based on the theory that it is not a limestone at all because it contains too much magnesium carbonate, the Government taking the position that a limestone must be predominately composed of calcium carbonate.

James River's contention, on the other hand, is that the purpose of the higher depletion rates, like the purpose of the high depletion rate on oil and gas, is to encourage the discovery of additional deposits of stones in short supply; that a high grade stone that can be used for metallurgical purposes, whether predominantly composed of calcium carbonate or of both calcium carbonate and magnesium carbonate, is commonly called a limestone and is much scarcer than dolomite, which is a catch-all term used to cover many different and frequently common types of stone, and that therefore such high grade stones quite properly should have been, and in fact were, granted a higher rate of depletion than the ordinary dolomites. I believe that James River is right.

We start with the proposition that James River's product is concededly a dolomite. I think that it is also a limestone within the common usage of the term; and that it is used almost exclusively for metallurgical and chemical purposes.

I think that the proper construction of the quoted language of the Act is that if a stone is a metallurgical or chemical grade limestone it takes the 15% rate; if not, and it falls in one of the classes described in paragraph (ii) of the statute quoted, it takes the 10% rate; and, if it falls in neither of those two higher categories but is still a stone, it takes the 5% rate.

The Government seems to concede that the stone in question is high grade stone used for metallurgical and chemical purposes. But it says that it is not entitled to the higher depletion rate because it is not a limestone and further that even if it were a limestone it must take the lower rate because all dolomites must take the rate specifically provided for dolomites

even though they happen to be also metallurgical or chemical grade limestones and even though dolomites are not as scarce as the high grade metallurgical and chemical limestones and, in fact, are relatively common.

It would appear that the Government must concede that the purpose in giving a higher depletion rate on some stones than on others was to encourage exploration for stones that were in high demand and scarce supply. If so, its argument leads to the conclusion that Congress simply made a mistake in describing the classes that it intended to describe. This argument, however, is not supported by the testimony of Dr. Kenneth K. Landes, who was the advisor to Congress when it took this action. Dr. Landes was originally employed by the National Lime Association to prepare a summary of the reserves of high grade limestone as a basis for a request to Congress for a percentage depletion allowance for such limestone. Dr. Landes' report was presented to Congress and he appeared before the Ways and Means Committee in 1950 and was the only geologist heard by the committee on the subject of metallurgical and chemical grade limestone. Dr. Landes testified in this case that in his report he used the word "limestone" as including dolomite. There is, of course, a type of metallurgical and chemical limestone which is not a dolomite. It is called high calcium limestone. When asked if, in his report to Congress, he used the term "chemical and metallurgical limestone" to include both dolomite and high calcium limestone, he replied "I did and so stated in my report." And he said that he did so because the term "limestone" originally meant "a stone that will produce lime by burning" as both calcium and magnesium stone will. And he referred to the fact that the largest lime producing district in the United States produces lime from dolomite.

Dr. Landes was the only technical man who appeared before Congress in connection with this matter and there can be no reason to think that Congress used the term any differently from the way Dr. Landes used it—and if it had done so, it would have been defeating in large part the very purpose of the higher depletion allowance for high grade chemical and metallurgical limestone.

As well put in James River's brief in this case:

"To summarize, Dr. Landes' testimony and the printed record of the Committee Hearings show, beyond the slightest shadow of a doubt, that (1) Dr. Landes advisedly and with full knowledge of the various uses of the term 'limestone' used it in his report in its broad sense as including dolomite; (2) that he specifically stated that he was using it in this sense because, in his judgment, that was the usage of industry; and (3) that his was the only usage brought to the attention of the Congressional Committees during their consideration of this statute.

"It is inconceivable that, in granting the very thing that Dr. Landes had asked for, Congress, from out of the blue, adopted a usage at variance with that of Dr. Landes."

█ The Government contends that "limestone" is often used in a sense that excludes dolomite and there was some evidence to this effect. There was also ample evidence as to its use as including dolomite and I find from the weight of the evidence that it is more generally so used. And, as indicated in the quotation above, it must have been used in that sense by Congress, both because Congress' only advisor on the subject was using it in that sense and also because it would not have been logical and in line with the purpose of the section to exclude from the higher depletion allowance a type of high grade metallurgical and chemical stone that was in scarce supply but happened not to be called a limestone by some people though it clearly was by others.

Supporting Dr. Landes' testimony was that of Dr. Byron N. Cooper, head of the Department of Geological Sciences at Virginia Polytechnic Institute. Dr.

Cooper referred to and quoted from reports that he and Dr. R. S. Edmundson, head of the Geology Department of the University of Virginia, had prepared after a study of the limestone belts in the Appalachian Mountains in Virginia over a period of fourteen years. Before testifying in this case Dr. Cooper made an extensive review of the literature of the subject and referred to and quoted from thirty different geological works in all of which the word "limestone" was used as including dolomites. The photostated pages from these various works showing the use of the terms as contended for by James River occupy 183 pages of the record and in my judgment are conclusive of the fact that the terms are usually used with the meanings contended for by James River in this case. The Government's evidence in favor of the usage it contends for was insignificant by comparison. I think it is clear that the usage of the terms contended for by James River is the common usage of science and the commercial world that deals with these articles. And certainly it was the usage of the man who drafted the section adopted by Congress.

Having found that the term "limestone" is usually used to include dolomites and that it was so used by Congress in the statute in question, it is not necessary to go into the question of whether or not "dolomite" is a more specific term than "limestone", since it is clear that it is not as specific as "metallurgical * * * (and) * * * chemical grade limestone" which we find does include some high grade dolomites, though not all dolomites.

Having said this much, I must go on to admit that the case law, which is limited and unsatisfactory, is, on the whole, to the contrary of the view I have taken.

The only case which has supported the taxpayer's position is Fannin Investment Company, Inc. v. United States of America, Civil Action No. 6830 of the Northern District of Georgia. A copy of the order in that case has been supplied to me by James River and the facts bring it squarely within the facts of this case.

But it contains no discussion of the legal problem.

On the other hand, the case law upon which the Government relies, and which is comparatively voluminous, is also pretty weak.

The earliest case decided (1959) is Albin C. Halquist, 33 T.C. 304. In that case the Tax Court held that the taxpayer's product, which contained 51.72% calcium and 45% magnesium carbonate with the remaining percentage impurities was a limestone, thus siding to that extent with the taxpayer's position here. But it went on to hold that as a dolomite it took only the 10% depletion rate specifically provided for dolomites rather than the higher rate provided for chemical and metallurgical limestone, thus taking the view the Government takes here. The opinion contains the following paragraph:

"We do not believe it is within our province to assume that Congress intended to include a high-grade dolomite within the classification chemical or metallurgical grade limestone when it specifically granted a 10 per cent rate to dolomite. This would be true even if we accept petitioners' contention that the term 'limestone' is commonly understood to include dolomite and that dolomite with a combined carbonate content of 95 per cent would qualify as a chemical or metallurgical grade limestone. Absent some evidence that Congress intended the latter phraseology to encompass high-grade dolomite and thus overlap the term 'dolomite' specifically used in the 10 per cent category, we will apply the concept stated in the conference report quoted above that when a 10 per cent rate was specifically provided for dolomite, that rate shall apply to all dolomite, whether it could also be classified as stone entitled to a 5 per cent rate, as argued by respondent in Virginian Limestone Corporation, supra, or as chemical or metallurgical grade limestone entitled to a 15 per cent rate, as argued by petitioners here."

In our case we do have conclusive evidence, which was lacking in the Halquist case, that Congress did intend to include dolomites that were in fact high grade metallurgical or chemical limestone within the 15% category.

In the next case, Erie Stone Company v. U.S.A., 181 F.Supp. 942, District Court Judge Kloeb decided the case on the basis of the theory, here advocated by the Government, that dolomites are rocks high in magnesium carbonates and that limestone is distinguished from them by having a calcium carbonate content "far in excess of the magnesium content." He said (at p. 945):

"As we have heretofore stated, the parties agree that the product of Taxpayers' quarries is 'dolomite'. With this agreement we are in accord. We have looked upon 'dolomite' as being a rock rich in magnesium carbonates, and composed of 90% or more of the mineral dolomite, and we have looked upon 'limestone' as being a high calcium carbonate rock having a calcium carbonate content far in excess of the magnesium content. In other words, in the dolomite the magnesium carbonate content is in high percentage, ranging up to 46%, and in the limestone the calcium carbonate content is high, ranging up to 95%. Various authorities differ on the percentage of content of magnesium or calcium carbonates in order to arrive at a determination of whether the rock is dolomite or limestone. In the product of Taxpayers, we believe that it is pretty well agreed between the parties that the calcium carbonate content ranges from 52% to 56%, that the magnesium carbonate content ranges from 41% to 45%, and that the impurities constitute 3% or less. It does not seem to be in serious dispute that Taxpayers' stone contained in excess of 90% of the mineral dolomite.

"We, therefore, agree with Counsel that the product here in question is a high grade 'dolomite'. We agree

then with the conclusion in the case of Halquist v. Commissioner of Internal Revenue, 33 T.C. 304, wherein it is said:

" 'We do not believe it is within our province to assume that Congress intended to include a high-grade dolomite within the classification chemical or metallurgical grade limestone when it specifically granted a 10 per cent rate to dolomite. * * *' "

Upon appeal, 6 Cir., 304 F.2d 331, the decision of the district court was affirmed by a divided court. The majority, in two separate opinions, did not reach the fundamentals of the argument but relied upon the theory that where there was a difference of opinion as to what was meant by "dolomite" a factual question was presented on the evidence and that the factual determination of the lower court should be upheld. Judge McAllister dissented in an extended opinion, the heart of which is to be found in the following paragraphs from page 333:

"It is my view that a fair reading of the evidence, as hereafter appears, discloses that 'stone' is a general term, as used in subsection (i) of the above-mentioned statute, and includes 'dolomite,' and limestone. 'Dolomite' is included in the term limestone; and limestone of a metallurgical and chemical grade includes dolomite of a metallurgical or chemical grade. In other words, this case is a striking instance where a statutory definition of one material overlaps and includes another material.

"In support of the foregoing conclusions, I refer, first, to one of the controlling considerations in the case, the legislative history of the applicable provision of the statute, which discloses:

"(a) That the Senate Finance Committee Report which added the statutory provisions here in question, made clear that the various materials named in the statute and the depletion rates should be given their

customarily understood commercial meanings; and

"(b) That, in the Conference Report on the Statutory provision here in question, Congress recognized it had used overlapping terms to describe different materials, and laid down the rule that it was to be understood that 'in any case where a mineral is specifically provided for at a stated rate of percentage allowance, that the specific provision will govern over the allowance provided (whether higher or lower) for a more general classification.' "

Judge McAllister's opinion also reviews extensively the dictionary definitions and the testimony of Dr. Landes before the House Ways and Means Committee and his use of the terms. Judge McAllister concludes:

"From the foregoing, I conclude, in this case, that the term, limestone, includes dolomite; and that limestone of metallurgical and chemical grade includes dolomite of a metallurgical and chemical grade."

Finally, there is the case of Vulcan Materials Company v. Sauber, 306 F.2d 65, a unanimous decision of the 7th Circuit, upholding the Government's position. The basis of the decision is found in the following quotations:

"Several witnesses from the steel industry testified for the government. Their testimony is to the effect that the common understanding of the term dolomite is a high magnesium stone whereas limestone has a high calcium base; that dolomite and limestone are not the same; and that there is a definite distinction between limestone and dolomite.

"The testimony of the scientific witnesses is also to the effect that those who use quarried stone for industrial purposes draw a distinction between the terms 'dolomite' and 'limestone.' For example, one witness testified that limestone of high calcium content and dolomite have different uses; that either limestone or dolomite with more than 5% impurities is not preferably suitable for industry; and that when the magnesium compounds industry orders dolomite with no more than 5% impurities, it knows what it is getting, whereas if it ordered limestone of no more than 5% impurities, it might not get dolomite.

"Another scientific witness, called by the taxpayer testified as follows:

" '* * * I admit that it [dolomite] is allied to limestones, and that it is a carbonate rock the same as limestone, and that in the broadcast sense dolomite can be a kind of limestone, but it is not sufficiently exclusive. Dolomite is a much more specific term than "limestone" '.

"This witness further testified that high grade dolomite which is suitable for chemical and metallurgical uses is not a chemical or metallurgical grade limestone.

"We believe the testimony of the witnesses establishes that dolomite is commercially known as a stone with a relatively high magnesium carbonate content and thus, is a more specific term than limestone which in its broader sense may be used to embrace all other carbonate stone."

If I had been convinced by the testimony in this case that the terms were used as the testimony in the Vulcan Materials case indicated to the District Judge and the Circuit Judges, I would, of course, decide this case in favor of the Government. But in my view the testimony in this case does not prove a usage of the terms such as was said to have been proved in the Vulcan Materials Company case. The testimony in the case at bar seems to me to be overwhelming to the effect that the term "dolomite" includes high-grade metallurgical and chemical limestones and so a dolomite can be, if of sufficiently high quality, a high-grade chemical or metallurgical grade limestone; and that the dolomitic stone produced by the taxpayer in this

case is such a high-grade chemical and metallurgical grade limestone.

It follows, therefore, that the plaintiff should prevail in this litigation. An order will be entered accordingly.